(No. 16098.—Judgment modified and affirmed.)
MARTIN K. DUNCAN, Defendant in Error, *vs.* J. ED DAZEY, Plaintiff in Error.

*Opinion filed October 28, 1925—Rehearing denied December 2, 1925.*

1. PLEADING—*when fraud is sufficiently charged in bill.* While the party who assails a transaction on the ground of fraud cannot make the charge in general terms but must allege the specific facts upon which he relies yet he is not required to plead the evidence, and allegations in a bill are sufficiently specific to support the charge of fraud where the facts and circumstances upon which the charge is based are specifically stated.

2. FRAUD—*fraud may be established by circumstances.* While fraud is never presumed and must be proved by clear and convincing evidence, yet in many instances direct and positive evidence cannot be adduced to show fraud and it may be established by circumstances as well as by direct testimony.

3. SAME—*when a confidential or fiduciary relation exists.* A fiduciary or confidential relationship exists where trust and confidence are reposed by one person in another, who as a result gains an influence and superiority over the first.

4. SAME—*a voluntary trust must be faithfully performed by fiduciary.* A party who, while standing in a fiduciary relation to another, voluntarily undertakes to act for the latter in the adjustment of his affairs is bound to perform the duty or service with fidelity, and a contrary attitude and conduct on the part of the fiduciary constitute actual fraud.

5. EQUITY—*when equity will not regard parties as in pari delicto.* If the parties are not, in fact, *in pari delicto* but the one perpetrating the fraud stands in a fiduciary or confidential relation and exercises influence over the other by means of the confidence reposed, equity may give relief to the one who is comparatively innocent, not for the sake of the party protesting but on the ground of public policy.

6. SAME—*Statute of Frauds cannot be invoked by party guilty of fraud.* Where a party has obtained title to property by fraudulent means a constructive trust is created in favor of the person equitably entitled to the property, and equity will not permit the party guilty of fraud to invoke the Statute of Frauds as a defense to the suit of the other party to regain his property.

7. SAME—*when Statute of Limitations and laches cannot be applied.* The Statute of Limitations does not strictly apply to suits

in equity, and *laches* or mere delay will not bar relief where the injured party, because of influence exercised by means of a confidential relation, was ignorant of the fraud and filed his bill within a reasonable time after acquiring knowledge of it.

8. INTEREST—*construction of section 2 of the Interest act as amended in 1891.* By the omission of the punctuation mark after the word "balance," in the amendment of section 2 of the Interest act in 1891, the legislature did not intend for the statute to allow interest only where money is retained without the owner's knowledge, as such construction would render the statute practically meaningless.

9. SAME—*equity will allow interest regardless of the statute.* Equity will allow interest in a proper case although not within the precise terms of the statute, and if it does not comport with justice interest may be disallowed.

HEARD, J., took no part.

WRIT OF ERROR to the Appellate Court for the Third District;—heard in that court on appeal from the Circuit Court of Shelby county; the Hon. WILLIAM B. WRIGHT, Judge, presiding.

BROWN & BURNSIDE, and WHITAKER, WARD & PUGH, for plaintiff in error.

C. C. MARTIN, ULYS PYLE, and J. R. FITZGERALD, for defendant in error.

Mr. JUSTICE DEYOUNG delivered the opinion of the court:

Martin K. Duncan on October 16, 1915, filed his bill for an accounting against J. Ed Dazey in the circuit court of Shelby county. While the suit was pending, after testimony had been taken, on March 26, 1917, the complainant filed an amendment to his bill. The bill as amended alleged, in substance, that Duncan was on September 22, 1903, the owner in fee simple and in possession of 180 acres of land in Shelby county; that the land was encumbered for $4000

and its net value above the encumbrance was $18,500; that for many years he had been intimately acquainted with Dazey, who was engaged in banking and other large business interests in and around Findlay, Illinois; that Duncan had been a patron of Dazey's bank and had co-operated with him in other enterprises; that Duncan was a man of limited business experience and judgment, and in the conduct of his affairs had followed Dazey's advice and counsel; that a fiduciary relationship, in which Duncan implicitly trusted and confided in Dazey, had grown up between them; that among the matters concerning which Duncan consulted Dazey was a divorce suit by Duncan's first wife; that in the settlement of the property rights involved in that suit she received certain encumbered real estate; that the encumbrance was the joint obligation of Duncan and his wife, but that in the settlement she had assumed and agreed to pay it; that she failed to keep her agreement, in consequence of which foreclosure proceedings followed and the proceeds of the sale lacked $1130.40 of discharging the debt; that Dazey advised Duncan that he, Duncan, was not liable for the deficit and that he ought not to pay it; that about August 18, 1903, a suit was instituted by Laura E. Graybill against Duncan to recover the deficit; that on September 22, 1903, Dazey came to the home of Duncan and informed him that he, Dazey, while at Shelbyville had learned of the institution of the suit; that Duncan had no prior knowledge of the suit nor had he been served with process; that Dazey further stated that the suit would involve Duncan in a long litigation and ruin him and that he would better transfer his property to Dazey, and to avoid service of process in the suit should immediately leave the State; that Dazey stated the amount claimed in the suit was $3300, although only $1130.40, exclusive of interest, was demanded; that on September 22, 1903, Dazey first designed to defraud Duncan out of his property and took the suit by Mrs. Graybill as his pretext; that confiding and

trusting in Dazey and acting upon his advice, Duncan on the evening of September 22, 1903, at Dazey's bank, executed a deed, by which he conveyed his 180-acre farm to Dazey without any consideration; that at the instance of Dazey, Robert N. Peadro, an attorney, was present when the deed was executed and advised Duncan that his action was in all respects regular and proper; that, continuing to act upon Dazey's advice and counsel, Duncan immediately thereafter left Shelby county and within a few weeks located at St. Louis, Missouri; that at the time Duncan left the State there was a matured crop on the land, of which Dazey took charge and collected the proceeds, amounting to $1500; that in the ensuing year Dazey also received $1500 in rents from the land; that during the years 1905, 1906 and 1907 the land was held in the name of John S. Fry for the benefit of Dazey, and that he should be compelled to account to Duncan for the fair cash rental value of the land for that period, which was $1500 per year; that for a long period after the farm was conveyed to him Dazey recognized that he held the land in trust for Duncan and for several years rendered accounts of his acts to him; that afterwards Dazey represented to Duncan that it was necessary to sell the land, because he, Dazey, feared that a creditor's bill might subject the property to the satisfaction of the claim made by Mrs. Graybill; that on or about February 15, 1905, Dazey transferred the land to Fry and represented to Duncan that he had sold it for $90 per acre, although the land was then worth $125 per acre; that Fry held the title to the land for the benefit of Dazey and sold the land to John Boyle on December 14, 1907, for $23,400, or at $130 per acre; that Duncan had no knowledge that the sale by Fry to Boyle was for Dazey's benefit until the fact was disclosed upon the hearing of this cause, and that Dazey should be required to account to Duncan for the sale price to Boyle, with interest.

The bill as amended further alleges that shortly after the conveyance to Boyle, Duncan's father died and Duncan inherited a share of his father's estate; that at that time the suit by Laura E. Graybill was still pending, and to defeat that suit, by Dazey's advice Duncan on March 28, 1905, assigned to Dazey his interest in his father's estate; that the assignment purported to secure a note for $3015, dated October 21, 1904, a note for $700, dated September 17, 1903, and an overdraft on the First National Bank of Findlay for $1465; that there was a note for $700, but the alleged overdraft and note for $3015 were non-existent; that on April 6, 1905, without consideration, Duncan executed and delivered a judgment note to Dazey, antedated to meet the description in the assignment; that on April 7, 1905, by Dazey's advice, judgment was taken upon the note by confession in the circuit court of Shelby county and execution was issued; that the judgment remains in force, and Dazey has recently claimed the right, notwithstanding his written acknowledgment to the contrary, to enforce the judgment and has issued *scire facias* thereon; that Dazey took the judgment for the sole purpose of defeating the claim of Mrs. Graybill until a transfer of Duncan's interest in his father's estate to one Herron, who was Dazey's agent, could be filed for record; that Dazey induced Duncan to convey by deed and assignment to the same Herron all Duncan's interest in his father's estate, and that on or about April 10, 1905, by virtue of the deed and assignment, Dazey received $2053.43; that in the suit by Mrs. Graybill judgment was rendered against Duncan on December 31, 1907, for $1724.36, and that it remained unsatisfied until the summer of 1915, when it was paid by the sale in partition of Duncan's interest in certain land; that during all these years Dazey represented to Duncan that Mrs. Graybill's suit was still pending and that he could not account to him until that suit was finally terminated. The bill as amended further alleges that upon Duncan's departure from

Illinois Dazey took charge of Duncan's bank account, drew checks in his name, settled his affairs and paid his debts; that Dazey honored Duncan's checks out of moneys realized from the sale of Duncan's property; that in honoring such checks Dazey recognized Duncan's claims; that Duncan received $8000 from Dazey, for which Dazey is entitled to credit upon an accounting; that Dazey has possession of the bank books, checks and accounts and nearly all of the memoranda relating to the property placed in his hands and the payments made by him, and that Duncan is therefore unable to state a true account. It is also alleged that immediately after the judgment in favor of Mrs. Graybill was paid, Duncan resumed his residence in Shelby county; that until that time Duncan, by Dazey's advice, continued to reside out of Illinois and had no knowledge of his fraudulent design nor any ground for suspecting it; that Dazey, to defraud Duncan, urged him to go into bankruptcy, although Dazey well knew that such proceedings would not benefit Duncan and that his property in Dazey's possession far exceeded in value the aggregate of his debts; that Dazey, in furtherance of his design, advised Duncan to go to Argentine, proposing to pay his expenses, and warned him of the danger of arrest and that he should remain beyond the jurisdiction of the courts of Illinois; that he advised Duncan to address him in plain envelopes; that he induced Duncan to transfer property to him worth $25,000, and for many years practically to remain a fugitive from the State for the sole purpose of defeating a claim which amounted, in principal, to $1130.40, and with interest to $1724.36; that Dazey accomplished this result by the mastery which he gained over Duncan, by the great confidence which Duncan reposed in him and by the unfounded fears which he inspired in Duncan; that Duncan acted in good faith and in the belief that he was following the proper and lawful course to protect himself from unjust and unlawful demands upon him; that he acted solely upon the advice

and under the direction of Dazey, without any intent to hinder or delay his creditors, and that he is not *in pari delicto* with Dazey. In addition to an accounting, the prayer of the bill as amended asks that the collection of the judgment rendered on April 7, 1905, be enjoined.

Dazey by his amended answer admitted that he took title to the land but denied every other material allegation of the bill as amended. He averred that he had overpaid Duncan and that Duncan did not come into court with clean hands, and he interposed as additional defenses, *laches,* the Statute of Limitations and the Statute of Frauds.

The cause was referred to a special master in chancery, who found that Duncan had conveyed his property for the purpose of defrauding his creditors; that Duncan and Dazey were *in pari delicto;* that Duncan was not entitled to an accounting, and recommended the dismissal of the bill as amended for want of equity. Duncan filed objections to the master's report, which were overruled and stood as exceptions on the hearing before the chancellor. The exceptions were likewise overruled and the bill as amended was dismissed for want of equity. Duncan prosecuted an appeal to the Appellate Court for the Third District. That court held that Duncan relied upon and followed Dazey's advice in the transactions of which complaint was made, and that Duncan was not equally guilty with Dazey in the attempt to defraud the former's creditors. Accordingly the decree was reversed and the cause remanded, with directions to re-refer the cause to state an account between the parties. On the re-reference the master found that both parties were at fault but in different degrees, and that Dazey was the more culpable; that he should be charged, among other items, with $23,400, the purchase price paid by Boyle, and rent for the years 1905, 1906 and 1907, at $900 per year; that after allowing Dazey certain credits there remained due to Duncan on April 1, 1921, $10,325.11, with interest thereon at the rate of five per cent per annum from

March 1, 1909, amounting to $6228.03, making a total due Duncan from Dazey of $16,553.14. Objections to the master's report, filed by both parties, were overruled. The objections stood as exceptions on the hearing before the court.

On January 2, 1923, the circuit court entered its decree, by which it found, among other things, that Dazey induced Duncan by fraud to convey to him the land and other property described in the bill as amended, and that Dazey should account to Duncan for such property, or its proceeds, and the profits derived therefrom; that the conveyance to Fry on February 15, 1905, was for the benefit of Dazey, and that he actually received the proceeds from the sale of the land to Boyle on December 14, 1907. It was ordered that the master's report be approved except as to the item of interest charged against Dazey, which was disallowed; that Duncan have judgment against Dazey for $10,325.11 and costs of suit, including a master's fee of $500; that execution issue therefor, and that Dazey be enjoined from collecting the judgment recovered by him against Duncan on April 7, 1905. Dazey prosecuted an appeal to the Appellate Court for the Third District. That court, on its second review, eliminated an item of $351.28 with which Dazey was charged, and accordingly reduced the principal of the decree from $10,325.11 to $9973.83. Duncan had assigned as cross-error the disallowance by the circuit court of interest on the sum found to be due him. That cross-error was sustained to the extent of allowing interest at five per cent per annum from March 1, 1908, on $9900, which consisted of the difference between $16,200, for which the pretended sale to Fry had been made, and $23,400, the sale price to Boyle, namely, $7200, plus the rental of $2700 for the three-year period. Costs of suit, except the master's fees, were also awarded. To the extent of those fees the decree of the circuit court was reversed and the cause remanded, with directions to give further consideration to and to reassess the master's fees. Subsequently, upon Dazey's peti-

tion, a writ of *certiorari* was awarded by this court and the cause is here for further review.

Martin K. Duncan, the defendant in error, was sixty-nine years of age at the time of the institution of this suit. He had been married twice. His first wife was divorced from him in 1895. He married again in 1903. He owned a farm of 180 acres, located three and one-half miles southwest of Findlay, a village about nine miles north of Shelbyville, the county seat of Shelby county. The farm was subject to a mortgage for $4000. Duncan and his second wife resided upon this farm. He owned another farm of 142½ acres, located about eighteen miles northwest of Findlay. Dazey, the plaintiff in error, was engaged in the banking business at Findlay and had followed it for many years. The bank with which he was connected had been a private bank but later was re-organized as the First National Bank of Findlay. Dazey first became its cashier and afterwards its president. He was also engaged in other enterprises. Duncan and Dazey had been acquainted for a number of years. Since 1908 Duncan had done his banking business at Dazey's bank and they had been associated in the purchase and sale of livestock. Prior to 1895 Duncan had owned a farm of 92 acres, and for a part of its purchase price he and his former wife had given notes secured by a mortgage. In the settlement of their property rights in the divorce suit this farm was given to his first wife upon the agreement that she would assume and pay the encumbrance. She failed to pay the mortgage at its maturity and it was foreclosed in 1897. The proceeds of the master's sale were insufficient to pay the indebtedness and both Duncan and his former wife remained liable for the deficit. On August 18, 1903, suit was instituted by Laura E. Graybill against Duncan to enforce this liability. On September 22, 1903, Duncan and his second wife by warranty deed conveyed to Dazey the farm upon which they resided, subject to the existing encumbrance of $4000. At the same time

they conveyed the other farm of 142½ acres to Duncan's son, Aubrey, who occupied it. Beyond these facts there is conflict in the evidence.

The substance of the testimony offered on behalf of Duncan will be first stated. On or about September 21, 1903, Dazey called Duncan into his bank and informed him that there were two old notes outstanding against him, amounting to about $3300, which, although unjust, the claimants, with the assistance of an attorney named Chafee, were attempting to collect. Dazey told Duncan that a long litigation would ensue, and advised him to transfer his farm to Dazey and he would bring about an early adjustment of the matter, after which he would re-convey the farm to Duncan. He offered Duncan, as a matter of protection in the meantime, his bond for deed in the sum of $14,000. Duncan then informed Dazey that he also owned the farm occupied by his son, whereupon Dazey advised the conveyance of that farm to the son. Dazey also suggested the employment of an attorney named Richardson, of Shelbyville, to adjust the claims, and assured Duncan that his fee would not exceed $65. Duncan went home, consulted with his wife, and then drove to Moweaqua to see his son, at whose home he remained all night. While there his son telephoned an attorney named McDonald, of Decatur, to meet them at Findlay the next morning. McDonald met Duncan, his son Aubrey, and Dazey, at Findlay, and when the suggestion of transferring the farm to Dazey was made, McDonald said that such a conveyance would repose great confidence in a man. Dazey replied that Duncan had been a friend and he wanted to assist him. Duncan asked McDonald to investigate the records and to ascertain whether there were two notes outstanding against him. Dazey then volunteered to take McDonald to Shelbyville for the purpose of making the investigation, and they drove away together. That evening Dazey returned alone and drove to Duncan's farm. He informed Duncan that McDonald

wished to return to Decatur directly and had done so, but that McDonald had found the notes to be just as he, Dazey, had represented. Dazey told Duncan they could consummate the matter themselves. He then requested Duncan to come to the bank with his wife as soon as they could, and that he and Claude Laughlin, who was also connected with the bank, would draw the necessary papers. Dazey said that a subpœna had been issued for Duncan, which the sheriff might serve at any time. On that evening Duncan, his wife, and Aubrey Duncan, came to the bank and there met Dazey, Laughlin and R. N. Peadro, an attorney from Sullivan, Illinois. Peadro was not present at Duncan's request. The transfer of the farm was discussed, and Duncan told Dazey that he was making a great confidant of him, to which Dazey replied that he would not wrong Duncan. Dazey again stated that Duncan would be ruined unless he made the conveyance. The two deeds were then executed and delivered without consideration. Dazey also told Duncan that the obligation upon which the suit was brought by Laura E. Graybill would be outlawed in three days, but that he should leave the county. It was understood that Duncan wished to retain the farm conveyed to Dazey as his home; that Dazey would pay Duncan's debts, except the claim made by Mrs. Graybill; that the mortgage would remain on the farm and that Dazey would account for the crops. At that time Duncan had about $300 on deposit in the bank, 120 acres of the farm were in meadow, 23 acres in corn, 30 acres in pasture and the rest in oats. Approximately fifty tons of clover, ninety tons of timothy and some old corn were on the farm. Timothy was worth $10 a ton and clover somewhat less. The twenty-three acres of corn would yield about sixty bushels to the acre and the corn was worth forty-five cents per bushel. There were from fifteen to eighteen cattle, a few hogs, five or six brood sows and several shoats. Eight or ten of the cattle were worth $50 to $60 each and the rest were calves. Mrs. Dun-

can and the hired man were to remain on the farm, which was to be conducted as before. The plan was outlined by Dazey. After the deeds had been executed Duncan went to his son's house for the night and left the next day. He first visited certain cities in the vicinity of Findlay and then proceeded to Chicago. From Chicago he went to Tulsa, Oklahoma, and after remaining there a short time settled in St. Louis, where he bought a membership on the board of trade. Contrary to the arrangement, within three days after Duncan's departure his wife left the farm and moved her household goods to Moweaqua. About that time, pursuant to Dazey's directions, Aubrey Duncan, with the assistance of men suggested by Dazey, removed practically all of the crops, livestock and implements from the farm.

On February 15, 1905, Dazey and his wife by warranty deed conveyed the farm to John S. Fry for the expressed consideration of $16,200. In payment of the purchase price Fry executed two mortgages, the first for $11,000, to one Coleman, and the second for $5700, to Dazey. The second mortgage not only included the balance of the purchase price above the first mortgage but also a commission of $500 which Dazey had paid to obtain the first mortgage. Duncan had no knowledge of the conveyance to Fry at the time it was made, but Dazey later informed Duncan and his son Aubrey that he sold the farm to Fry because Laura E. Graybill and Chafee, her attorney, sought to make him trouble and he wanted to get the farm out of his hands.

Duncan's father died in March, 1905. To prevent the subjection of Duncan's interest in his father's estate to the claim of Laura E. Graybill, by Dazey's direction Duncan assigned that interest to Dazey and executed a judgment note for $3015, dated as of October 21, 1904. There was no consideration for either instrument. On April 7, 1905, Dazey obtained judgment by confession against Duncan for $3404 upon the note so given. On the back of a letter writ-

ten by Duncan to Dazey concerning the estate of his father, Duncan wrote the following:

"this is a copy of my agreement of M. K. Duncan & J. E. Dazey & on the night of Aprile 6 I turned over judgment note of $3000 two protect my interest from a judgment that George Shafey and Larey Graybill holds that I don't owe nor have I sesieved one sent for same confession of said judgment note this my seal.

M. K. DUNCAN."

On April 8, 1905, Duncan and his wife, at Dazey's request, without consideration, conveyed by deed to R. M. Herron, a clerk under Dazey, Duncan's interest in his father's estate. Dazey stated that Herron would do whatever was desired of him, and that Dazey would be responsible for the money received and pay it to Aubrey Duncan. Herron on April 18, 1905, filed a bill for partition of the real estate left by Duncan's father. The proceeding resulted in a sale, and out of the proceeds Dazey received on April 10, 1906, $1453.43.

Duncan and his son Aubrey, Dazey and Peadro met in St. Louis about March 22, 1906, after the purported sale to Fry, and a settlement was under consideration. Dazey wanted to settle at $90 per acre. He said that 60 acres had not been sold and asked Duncan what he would give for that part of the land. Duncan replied that Dazey was responsible to him for the farm, and that he wanted either the whole of it back or the money. Dazey offered Fry's second mortgage notes, aggregating $5700, in settlement. The mortgage had not been recorded. Duncan refused to accept the notes, and Dazey promised to pay Aubrey $5700 in money for his father if he would call at the bank the next week. Aubrey met Dazey at Findlay pursuant to the appointment. Dazey said he would settle with Aubrey's father without trouble; that the deposits at the bank were low; that he expected additional money in about a month and that he would then make payment. When Aubrey returned after thirty days, Dazey said that he could not make payment because of the pendency of Mrs. Graybill's suit.

In 1907 Dazey told Thomas Finnigan, a real estate agent, that he had a farm of 180 acres for sale; that he thought John Boyle could purchase it and that in the event of a sale he would pay a commission of $500. Finnigan took Boyle to see the land. Boyle then went to Dazey, who called Fry to the bank. Dazey said Fry wanted $130 per acre. Boyle offered Dazey $23,400 for the land and the offer was accepted. Fry and his wife by warranty deed dated December 14, 1907, conveyed the farm to Boyle. As a part of the purchase price he assumed the existing first mortgage to Coleman for $11,000 and the second mortgage to Dazey for $5700, gave his note for $2700, and paid the balance of $4000 by a check made payable either to Fry or to Dazey's bank. The check was given to Dazey. Fry kept his account at the First National Bank of Findlay. To show that the check had not been deposited to Fry's credit, Duncan subpœnaed E. M. Vennum, the cashier, to produce the record of the account from January 1, 1905. Vennum testified that the bank's books had been balanced; that there was no record of an account with Fry, and that, so far as he could learn, Fry had never had an account with the bank. On December 16, 1907, the farm was leased by Boyle to Fry for one year, from March 1, 1908.

Duncan returned to Findlay and other places near his old home at infrequent intervals and Dazey occasionally went to St. Louis. Duncan was served with process in the suit instituted by Laura E. Graybill on Sunday, June 18, 1905, while he visited Shelbyville. An attempt was made to quash the service, but it was unsuccessful. Dazey, however, informed Duncan that the service had been quashed. Subsequently, on December 3, 1907, judgment was rendered against Duncan in that suit for $1724.36 and execution was issued. Joseph Duncan, a brother of the defendant in error, died intestate on October 26, 1914. As an heir Duncan had an interest in his deceased brother's estate. To prevent the satisfaction of Mrs. Graybill's judgment Dazey

318—33

requested Aubrey Duncan to obtain from his father either a note upon which judgment might be confessed or a quit-claim deed of his interest.  Dazey preferred a deed.  Such a note was obtained and preparations were made to take judgment upon it, but the plan was abandoned when the quit-claim deed was forthcoming.  Before that deed was filed for record, however, the lien of Mrs. Graybill's judgment had attached.  Later, on November 6, 1914, Aubrey Duncan, the grantee in the deed, filed a suit for partition. The judgment in favor of Mrs. Graybill was finally paid on November 6, 1915, out of Duncan's share of the proceeds of sale made pursuant to the decree in the partition suit.

When Duncan ascertained, early in 1915, that payment of the judgment recovered by Laura E. Graybill would be enforced he returned to Illinois and made his home at Moweaqua, in Shelby county.  In June of that year he, with his wife, son and brother-in-law, went to see Dazey about a settlement.  At that time Dazey refused to confer with Duncan, because he said Duncan became angry when they talked, but if Aubrey would come back later, he, Dazey, would go over matters with him.  An interview between Dazey and Aubrey followed, but it was not productive of any result.  Acting for his father, Aubrey had tried on a number of occasions during his father's absence of twelve years to obtain a settlement, but he was uniformly unsuccessful.  In September, 1915, Dazey informed Aubrey that he understood Duncan had consulted attorneys, and that he might sue if he desired to do so.

A number of letters were introduced in evidence on behalf of Duncan.  Those written by him afford ample evidence of his illiteracy, while those written by Dazey show his initiative and energy in the conduct of Duncan's affairs. Dazey often suggested that Laura E. Graybill and her attorney were actively attempting to make collection of her claim; that he did not know the extent of their activities, but that he, Dazey, to the time of writing had been success-

ful in defeating them; that Mrs. Graybill's attorney was angry and that Duncan should not meet either of them. In one letter Dazey wrote: "It would be best to keep away from them. If you get arrested, fight the requisition papers, and if I am at home I will come down." Dazey also suggested that Duncan use an assumed name and urged him to go to Argentine. Both Dazey and Peadro at different times advised Duncan to file a petition in bankruptcy. Other letters from Dazey show a purpose on his part to intensify Duncan's apprehensions and to inculcate in him the conviction that his continued absence from the State was necessary to avoid financial ruin.

The substance of the testimony offered on behalf of Dazey is as follows: His relations with Duncan were merely those which exist between a banker and his depositor. Prior to 1903 he had not advised Duncan concerning his business matters or domestic troubles. Duncan had told him of Laura E. Graybill's claim, and that he wished to defeat it because his first wife had agreed to pay the claim in the settlement of the divorce suit. Duncan said that he would rather lose the farm than pay his first wife's debts. On the day the deed was executed Dazey met Duncan and attorney McDonald from Decatur, who, Duncan said, had come to close the transaction. When McDonald wished to go to Shelbyville to look up the records for Duncan, Dazey offered the use of his horse and buggy. J. G. Cutler took McDonald to Shelbyville and returned in the afternoon with attorney Peadro. Cutler testified that he drove a stranger to Shelbyville and after his return went to the farm with Peadro, where they met Duncan. Duncan and Peadro engaged in conversation. Peadro represented Duncan, and neither Peadro nor McDonald became interested in Duncan's affairs at Dazey's suggestion. Duncan returned to the bank with his wife and Dazey executed a bond for a deed to Duncan in order to appease Mrs. Duncan. The deed was then executed and delivered. At first Duncan asked

more than $90 per acre for the farm, but Dazey offered him that figure and Duncan accepted it. The understanding was that Dazey should pay for the farm when he re-sold it; that Duncan should have the crops, and that he would pay interest on any money which Dazey might advance him. Much of the testimony offered by Duncan was denied, particularly that Mrs. Graybill's claim would be outlawed in a few days, that the litigation would be extended, that attorney Richardson would for $65 defeat Mrs. Graybill's claim, that Dazey had advised Duncan to leave the State, or that he, Dazey, had anything to do with the removal of the crops, livestock and implements from the farm. Homer and Jesse Brown both testified that they removed the household goods from the farm to Moweaqua at Duncan's direction, and that he stated to them that he had sold the farm to Dazey for $90 per acre.

A letter of January 25, 1904, tended to show that Duncan had authorized Dazey to sell 120 acres of the farm at $100 per acre and the remaining 60 acres at $85 per acre. Dazey asserted that the sale to Fry was *bona fide,* and that from the time of its consummation he had no further interest in the farm. After deducting the principal of the first mortgage to Coleman, $11,000, from the purchase price a balance of $5200 remained. The second mortgage for $5700 to Dazey included this balance, plus the commission of $500 paid for negotiating the first mortgage. Dazey paid the first year's interest on the mortgage to Coleman. After the transfer Fry made improvements out of the proceeds of the sale of his equity of redemption in a 40-acre farm. He remodeled the house, built fences and outbuildings, dug a well and erected a windmill. The cost of these improvements was approximately $1500. Prior to 1903 the improvements on the farm were of little value and its drainage was in poor condition. After the transfer Fry sold the grain from the farm and deposited the proceeds to his credit in Dazey's bank.

There was an actual settlement with Duncan in St. Louis in March, 1906, based upon the sale to Fry. Dazey submitted a statement to Duncan, and Aubrey, his son, examined it and said that it was satisfactory. Duncan was offered the second mortgage for $5700 given by Fry, but he preferred the money. Dazey denied that Duncan told him that he was responsible for the farm, that Aubrey came to Findlay to get money in lieu of the notes executed by Fry, or that he, Dazey, postponed payment because the bank's deposits were low. Later, Dazey made payments to Duncan aggregating $5700.

The consideration for the conveyance to John Boyle on December 14, 1907, $23,400, and the manner of its payment by the assumption of the first mortgage for $11,000, the second mortgage for $5700, the execution of a note by Boyle for $2700, and the payment of the balance of $4000 in money, were admitted. Later, however, on Dazey's application to the circuit court for a rehearing, he appended to his petition an affidavit by Boyle, in which Boyle stated that in making the purchase he paid Fry the excess of $6700 above the sum of the two mortgages in money.

Fry transacted his banking business at Dazey's bank. The record of Fry's account at that bank was offered in evidence by Dazey on the second hearing. It covers the period from October 19, 1905, to March 6, 1912. On November 27, 1907, shortly before the conveyance to Boyle, Fry's balance was $90.55. From that date to May 12, 1908, the deposits were as follows: January 11, 1908, $34; January 24, $58; February 13, $678.54; March 24, $79.17; April 20, $40.85 and April 28, $30. The withdrawals during the same period resulted in an overdraft on April 24, 1908, of $733.77, which was increased to $954.77 on May 5, 1908. A week later, on May 12, 1908, the overdraft was refunded and the account was balanced. From May 12, 1908, to January 13, 1909, sixteen deposits were made by Fry, aggregating $5321.99, of which the two largest were

$584 on September 7, 1908, and $2828.84 on December 29, 1908. During the same period thirty withdrawals were made, of which the largest, save one, was $216 on December 4, 1908, and the largest was $4014.61 on January 13, 1909, which resulted in an overdraft of $11.13. The bank's record of Boyle's account from October 19, 1905, to December 31, 1908, was also introduced. It shows, among other items, a withdrawal on December 16, 1907, of $4000. Later, Boyle sold and conveyed the farm to Charles Fitzwater, who paid the first and second mortgages.

Dazey, and Claude B. Laughlin, formerly assistant cashier of Dazey's bank, had both signed Duncan's name to checks. Their authority was Duncan's permission to do it. Duncan frequently overdrew his account and it was Dazey's practice to adjust it for him.

Witnesses who testified concerning the value of the farm did not agree. Those who appeared in behalf of Duncan fixed the value from $100 to $130 per acre. Witnesses called by Dazey testified that the land was worth from $75 to $95 per acre, although one witness stated that a portion of the land was worth about $45 per acre.

The contentions upon which plaintiff in error, Dazey, relies are in substance: (1) That the facts constituting the fraud charged were neither specifically alleged nor proved as alleged by clear and convincing evidence; (2) that no confidential or fiduciary relationship between the parties was shown; (3) that defendant in error conveyed his property to hinder, delay and defraud his creditors, and that a court of equity will not, for that reason, afford him any relief; (4) that there was constructive fraud on his part; (5) that the Statute of Frauds is a defense to the suit; (6) that a parol promise to hold the land in trust cannot be enforced, because the conveyance made by defendant in error was for an unlawful purpose; (7) that the Statute of Limitations and *laches* bar the instant suit; and (8) that no interest should have been allowed upon the sum found due, if any,

upon an accounting. These contentions will be considered in the order of their statement.

*First*—The relations which existed between the parties, the circumstances under which and the representations by which Duncan was induced to convey his farm and other property which he later inherited, Dazey's statement concerning the claim by Laura E. Graybill and the consequences of her suit, Duncan's departure and absence from the State by his direction, his control of Duncan's property, the conveyance to Fry for Dazey's benefit, and the subsequent sale to Boyle, among other things, are set forth in the bill. The facts and circumstances upon which the charge of fraud is based are specifically stated. While the party who assails a transaction on the ground of fraud cannot make the charge in general terms but must allege the specific facts upon which he relies, yet he is not required to plead the evidence. (*Dickinson* v. *Dickinson,* 305 Ill. 521; *Bouxsein* v. *First Nat. Bank of Granville,* 292 id. 500; *Langlois* v. *McCullom,* 181 id. 195.) The allegations of the bill of complaint are sufficiently specific to support the charge of fraud.

The testimony shows that Dazey was a shrewd and energetic business man. Duncan was illiterate and of limited business capacity. Prior to the conveyance of the farm to Dazey, Duncan had been a depositor in Dazey's bank and they had engaged in other business transactions. Duncan was the owner of two farms, one of 180 acres, upon which he resided, and the other of 142½ acres, which was occupied by his son. He had no debt or claim which threatened him, except a balance due Laura E. Graybill upon certain purchase money mortgage notes, the payment of which his former wife had assumed. He rested in the belief that his original liability upon those notes had been extinguished. Even that liability, slightly in excess of $1100, would scarcely lead a man of Duncan's financial worth to convey both farms to avoid its payment. But Dazey inspired in Duncan's mind apprehensions of the effect of an attempt to

collect Mrs. Graybill's claim. He not only misrepresented the amount of the claim, but also that its prosecution might result in a long litigation and Duncan's financial ruin. These misrepresentations undoubtedly led Duncan to convey the principal farm to Dazey. According to Dazey's testimony, Duncan's wife was reluctant to sign the deed. The bond for deed, he admits, was executed for the purpose of inducing her to join in the conveyance. He advised Duncan's immediate departure from the county and State to avoid the great loss which, he stated, Duncan would suffer if service of process were obtained in Mrs. Graybill's civil suit. Not only was the farm conveyed to him, but when Duncan's father died, in March, 1905, he procured from Duncan a judgment note for $3015. Upon that note judgment by confession in Dazey's favor, against Duncan, for $3404, was immediately recovered. On the next day, again at Dazey's request, Duncan conveyed his interest in his father's estate to Herron, a clerk in Dazey's bank. The note and the deed were made without consideration. A partition suit filed by Herron resulted in a sale of Duncan's interest and the proceeds were paid to Dazey. When Duncan's brother, Joseph, died, more than nine years later, Dazey again became active to obtain a transfer of Duncan's interest. First a note was procured upon which Dazey proposed to take another judgment by confession, but the note was discarded when, on the next day, a deed was received. But in this instance Mrs. Graybill's attorneys proved to be too alert, and Duncan's interest was subjected to the lien of her judgment before the deed was filed for record. A partition of the brother's real estate resulted in the satisfaction of Mrs. Graybill's judgment by the application in its payment of the proceeds of the sale of Duncan's share. During all these years, from 1903 to 1914, Dazey was not only energetic in taking title to and charge of the major portion of Duncan's property, whether originally owned, as in the case of the farm, or acquired by descent, as the heir of his de-

ceased father and his deceased brother, but he continued by correspondence during the twelve years that Duncan was in practical exile from Illinois to emphasize the apprehensions under which he labored. He suggested that Duncan use an assumed name, that he go to Argentine, and that he file a petition in bankruptcy. He wrote Duncan that in the event of his arrest he should oppose extradition. Manifestly there was no legal ground for Duncan's arrest, nor any justification for Dazey's efforts to inculcate in Duncan's mind the fear that he would be ruined financially if he returned to Illinois. No average man of Duncan's age, who owned two farms and other property, however lacking in capacity to transact business, would of his own accord convey one farm to his banker and the other to his son, abandon his home and leave the State for an indefinite period, merely to avoid the payment of an indebtedness of $1130.40, even if he thought the claim wholly unfounded. Only the trust and confidence which Duncan reposed in Dazey, and the representations made by the latter, could induce Duncan to go to such lengths. The evidence shows that Dazey obtained possession and control of the larger farm and other property belonging to Duncan by the means stated, for the purpose of realizing an unwarranted profit or advantage therefrom.

But it is insisted that the circuit and Appellate Courts erred in finding that the sale by Dazey to Fry was merely colorable and that Dazey should account for the difference of $7200 between the consideration for the purported sale to Fry and the price later paid by Boyle, as well as the rents and profits for the years 1905, 1906 and 1907, at $5 per acre annually, or $2700 for the period. Dazey acquired the title in fee simple from Duncan subject to an encumbrance of $4000. When he conveyed the farm to Fry he effected a loan of $11,000 upon it, secured by a first mortgage to Coleman, which Fry executed. Dazey paid $500 commission for the negotiation of that mortgage. He took a second mortgage from Fry for $5700, which not only included

the balance of the purchase price, $5200, but also the commission so paid. Hence title passed from Dazey to Fry without the payment of any money or consideration other than the execution of the two mortgages. By the conveyance to Fry, Dazey exchanged his fee simple title for a junior mortgage on the same land. After the purported sale the land was subject to two encumbrances, the sum of which exceeded the purchase price. Fry's financial responsibility, as shown by the record of his bank account, added nothing to insure the payment of the mortgage notes. The mortgages on the land were a poor substitute for the land itself. An actual sale of real estate would hardly have been made or consummated in that manner. Moreover, when Dazey sought to effect a settlement at St. Louis in March, 1906, he told Duncan that 60 acres of the land had not been sold and asked him what he would give for that portion of the farm. This interview occurred after the conveyance to Fry, which included the whole farm, and if that conveyance represented an actual sale, Dazey could not have retained 60 acres and offered them to Duncan as unsold. Again, Fry was active in making the sale to Boyle in December, 1907. His activity might be explained to some extent because he was the holder of the junior mortgage, but he offered Finnigan a commission of $500 to effect a sale of the land, and a mortgagee, as such, would scarcely offer to pay a substantial commission for any such purpose. While the testimony on behalf of Dazey shows that Boyle gave a note for $2700 on account of the purchase price of the land, yet Dazey also offered, on his application for a rehearing in the circuit court, Boyle's affidavit, in which he stated that he had paid $6700 in money at the time the purchase was consummated. That sum was in full payment of the equity of redemption, for the balance of $16,700 was represented by the two encumbrances, the first for $11,000 and the second for $5700, neither of which, by Dazey's evidence, was paid by Boyle but by Fitzwater after

he purchased the farm from Boyle. Whether $4000 or $6700 was paid by Boyle at the time the deed was delivered to him, neither sum found its way to Fry's bank account. It is elementary, as stated by plaintiff in error, that fraud will never be presumed, and that it must be proved by such clear and convincing evidence that the mind is well satisfied that the charge is true. (*Mosbarger* v. *Brown*, 313 Ill. 238.) In many instances, however, direct and positive evidence cannot be adduced to show fraud. It may be established by circumstances as well as by direct testimony. (*Carter* v. *Carter*, 283 Ill. 324; *Wolf* v. *Lawrence*, 276 id. 11; *Schwarz* v. *Reznick*, 257 id. 479; *Bryant* v. *Simoneau*, 51 id. 324.) The facts and circumstances shown by the record convince us that the sale to Fry was colorable, merely, and for Dazey's benefit, and that the findings of the circuit and Appellate Courts in that respect were correct.

*Second*—It is insisted that no confidential or fiduciary relationship existed between the parties. Duncan transferred much of his property to Dazey at the latter's successive requests. He followed Dazey's advice and generally obeyed his directions. During Duncan's long absence from the State Dazey had possession of his property and even signed his checks. Their relationship was more than that which arises out of the ordinary commercial transaction where confidence is reposed in the integrity and punctuality of the debtor. Here Duncan was dominated by Dazey. A fiduciary or confidential relationship may exist where trust and confidence are reposed by one person in another, who, as a result, gains an influence and superiority over the first. (*Mors* v. *Peterson*, 261 Ill. 532; *Beach* v. *Wilton*, 244 id. 413; *Hensan* v. *Cooksey*, 237 id. 620; *Irwin* v. *Sample*, 213 id. 160; *Walker* v. *Shepard*, 210 id. 100.) Obviously, all the necessary elements of the relationship exist in this case.

*Third*—In the settlement of their property rights in the divorce suit Duncan's former wife assumed the payment of the note upon which Laura E. Graybill later brought suit

against Duncan. He believed that by the settlement his liability upon the note had terminated. While, as a matter of law, his position was unsound, yet he was justified in assuming that, as between himself and his divorced wife, payment of the note would not be demanded of him. Dazey led him to believe that he should not pay it under any circumstances, and induced him by intensifying, if not creating, fears and apprehensions on his part of the disastrous consequences which would follow the service of process in Mrs. Graybill's suit, to depart from the State. Both the amount involved and the effect of an adverse result in the suit were misrepresented by Dazey. Under no circumstances did the condition of Duncan's affairs justify the extremes which Dazey advised and directed. Duncan, by reason of his implicit confidence in Dazey, generally heeded the latter's instructions. Both were not equally culpable. Dazey was under no obligation to act for Duncan in the adjustment of his affairs, but when once he undertook to do so he was bound to perform that duty with fidelity. A contrary attitude and conduct on his part constitute actual fraud. (*Dazey* v. *Binkley,* 285 Ill. 513.) If the parties are not *in pari delicto,* equity may give relief to the one who is comparatively innocent, not for the sake of the party protesting but on the ground of public policy. *Woodall* v. *Peden,* 274 Ill. 301; *Herrick* v. *Lynch,* 150 id. 283; *Baehr* v. *Wolf,* 59 id. 470; 2 Pomeroy's Eq. Jur. (3d ed.) sec. 942.

*Fourth*—It is argued that Duncan voluntarily conveyed his property leaving debts unsatisfied, and that such a conveyance constitutes constructive fraud. When Duncan conveyed the farm to Dazey it was understood that all his debts, save the claim of Laura E. Graybill, which he deemed unjust, should be paid. Dazey induced that conveyance as well as the subsequent transfers. His influence over Duncan, which arose out of the confidence reposed in him, prevented free and voluntary action on Duncan's part. Duncan

cannot for that reason be charged with complete, if any, responsibility for his acts. Equity refuses to aid parties *in pari delicto,* but where one party is comparatively innocent the rule is not applicable. *Woodall* v. *Peden, supra; Herrick* v. *Lynch, supra.*

*Fifth*—Plaintiff in error invokes the Statute of Frauds as a defense to the suit. Equity will not permit a person to derive any benefit from fraud perpetrated by him. A frequent application of the rule is found in cases where one party has obtained title to property by fraudulent means. In such a case a constructive trust is created in favor of the person equitably entitled to the property. (*Feeney* v. *Runyan,* 316 Ill. 246; *Miller* v. *Miller,* 266 id. 522.) The purpose of the Statute of Frauds is to prevent fraud, and a court of equity will not permit the statute to be invoked to accomplish a fraud. *Corbly* v. *Corbly,* 280 Ill. 278; 2 Pomeroy's Eq. Jur. (3d ed.) sec. 921.

*Sixth*—A parol promise to hold the land in trust, it is argued, cannot be enforced, because the conveyance was made by defendant in error for an unlawful purpose. The rule is applicable where the parties are *in pari delicto,* but where one of the parties, as has been shown, is comparatively innocent the rule has no application.

*Seventh*—Plaintiff in error contends that the Statute of Limitations and *laches* bar the instant suit. The Statute of Limitations does not strictly apply to suits in equity. (*Moneta* v. *Hoffman,* 249 Ill. 56; *Greenman* v. *Greenman,* 107 id. 404.) The fact that Duncan was absent from the State for a long period, during which he did not institute suit, shows the extent of the influence which Dazey exerted over him rather than that he was guilty of *laches.* The facts with reference to the sale to Boyle did not come to the attention of Duncan until they were adduced upon the hearing of this case. There can be no *laches* where there is no knowledge, and mere delay will not bar relief where the injured party was ignorant of the fraud and filed

his bill within a reasonable time after acquiring knowledge of it. *Moneta* v. *Hoffman, supra; Bishop* v. *Thompson,* 196 Ill. 206.

*Eighth*—Plaintiff in error insists that the allowance of interest on the amount found due is erroneous. Prior to the amendment of 1891, section 2 of the Interest act, (Rev. Stat. 1874, p. 614,) so far as pertinent, read: "Creditors shall be allowed to receive at the rate of six percentum per annum * * * on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance; on money received to the use of another, and retained without the owner's knowledge." * * * By the amendment of 1891, (Laws of 1891, p. 149,) which reduced the rate to five per cent, the semicolon after the word "balance" was omitted, and the provision reads, "on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance on money received to the use of another, and retained without the owner's knowledge." It is argued that since the omission of the punctuation mark, interest can only be recovered on money received to the use of another and retained without his knowledge where there has been a settlement of accounts, and that interest will begin to run only from the day the accounts were liquidated and the balance due ascertained. How a person who has no knowledge of the receipt and retention of his money by another can, so far as such money is concerned, liquidate accounts with the other party is not easily discerned. To give the statute the interpretation insisted upon would leave no provision for interest on money due on the settlement of an account from the day the balance due was ascertained. To allow interest in such a case only when the money is received to the use of another and retained without the owner's knowledge renders the language practically meaningless. Such a result was not, we are convinced, the purpose and intent of the General As-

sembly. Moreover, this is an equity proceeding, and equity will allow interest in a proper case although not within the precise terms of the statute. (*Thompson* v. *Davis,* 297 Ill. 11; *Golden* v. *Cervenka,* 278 id. 409; *Keady* v. *White,* 168 id. 76.) The rule followed in equity is to allow interest where warranted by equitable considerations. If it does not comport with justice interest may be disallowed. (*McKey* v. *McCoid,* 298 Ill. 566.) Both upon equitable principles and by the statute the allowance of interest was proper.

While Fry occupied the farm he made certain permanent improvements upon it. These improvements enhanced the value of the farm and necessarily were included in the purchase price paid by Boyle. Whatever arrangements with reference to these improvements may have existed between Fry and Dazey need not be considered. In no event did Duncan pay for them, and it would be inequitable to allow him to recover their value. The testimony shows their cost to have been approximately $1500. Since Dazey is charged with the difference between the purported consideration for the sale to Fry and the price paid by Boyle, and with rent for the use of the land during the period Fry held title to it, a credit for the cost of the improvements should have been allowed him. Accordingly the judgment of the Appellate Court will be reduced from $9973.83 to $8473.83, with interest on $8400 at the rate of five per cent per annum from and after March 1, 1908. In all other respects the judgment of the Appellate Court will be affirmed.

*Judgment modified and affirmed.*

Mr. JUSTICE HEARD took no part in this decision.