# WESTERN POWDER MFG. CO. v. BREW-ERTON COAL CO.

## CENTRAL ILLINOIS ELECTRIC & GAS CO. v. MANUFACTURERS' FINANCE CO. et al.

### No. 5539.

Circuit Court of Appeals, Seventh Circuit.

Jan. 22, 1936.

Rehearing Denied Feb. 27, 1936.

William M. Acton, of Danville, Ill., and Roy F. Hall, of Rockford, Ill., for appellant.

Edward I. Rothbart, Norman M. Peterson, and Julius M. Rosenfield, all of Chicago, Ill., for appellees.

Before SPARKS and ALSCHULER, Circuit Judges, and STONE, District Judge.

STONE, District Judge.

This is an appeal from a decree in favor of the Manufacturers' Finance Company upon an intervening petition filed by the Central Illinois Electric & Gas Company in the case of Western Powder Manufacturing Company against Brewerton Coal Company, wherein receivers had been appointed for the Brewerton Coal Company with the power to operate certain coal mines.

For convenience, we will refer to the Central Illinois Electric & Gas Company as the electric company, the Brewerton Coal Company as the company, the Manufacturers' Finance Company as the finance company, and the Brewerton Coal Corporation as the corporation.

The petition filed by the electric company alleged the appointment of William A. Brewerton and Louis Clements as receivers for the company, and that they had been operating the mine by order of the District Court and selling the coal produced at the mines; that William A. Brewerton was the president of the corporation, and that on the day of the appointment of the receivers there was

presented to the court a petition which contained a proposal from the corporation to market the output of the mines. The proposal is partially set forth in the margin.[1]

The petition also alleged that the electric company had furnished power, water, and supplies to the receivers which were used in the operation of the mines, in the sum of $14,746.52, which was unpaid; that the electric company had purchased coal from the receivers in the amount of $10,066.24, which had not been paid; that the corporation claimed to own the account of the electric company for coal purchased, and to have sold and assigned it to the finance company; that the finance company had demanded payment of the electric company and threatened suit if the account was not paid; that the corporation had sold the coal as the exclusive sales agent of the receivers, and that the electric company had the right to set off out of the amount due it from the receivers the amount due from it to the receivers.

The receivers, the finance company, and the corporation filed answers admitting that the electric company had furnished power, water, and supplies to the receivers for use in the mines, and that the receivers were indebted to the electric company therefor; that the offer from the corporation relating to the marketing of the coal mined was accepted by the receivers pursuant to an order of the court; that the receivers and the corporation had been functioning under said agreement. The answers expressly denied that the corporation was a sales agency employed by the receivers, and alleged that all the coal produced by the receivers, with the exception of one load of coal delivered to the electric company in exchange for receivers' certificates, was sold by the receivers to the corporation. The answers alleged the sale of accounts receivable of the corporation to the finance company; that the coal purchased by the electric company was purchased by it from the corporation, and not from the receivers, and that the electric company had no right of set-off against the claim of the finance company; that the accounts receivable in controversy were at all times, until assigned to the finance company, owned by the corporation, and were never owned by the receivers, and that the receivers had no interest in said accounts receivable; that the electric company received payment of its bills for electric power, water, and supplies from the receivers, and that it had never made any claim against the corporation for such charges; that in one instance coal was sold to the electric company by the receivers, and this obligation was discharged

[1] "We propose that we will fill, or cause to be filled, in their entirety all salesmen's and sales office contracts from August 1, 1929, also all coal sales agreements and open coal orders now on hand for shipment of coal from the mines concerned, including those orders upon which partial advance payments have been made. We will purchase from the receiver the coal necessary for the fulfillment of all commitments. We will apply the utmost endeavors of our organization to obtaining further orders and contracts for the sale and delivery of coal from these mines. We are not marketing any products in competition with said coal. We shall not do so. We will pay to the receiver for the coal so purchased the full aggregate amount which shall be realized by us from the fulfillment of all coal orders and coal contracts, less the actual cost to us of the selling, the accounting and the supervision for receiver as hereinbefore provided (which said deductions shall not exceed a total of twenty cents per ton) and less one half of the excess of the result over the sum of the receiver's aggregate normal labor costs of production and maintenance, his cost of power and supplies, his cost of workmen's compensation payments and his sundry petty costs of mine offices.

"We will sell the coals at prices which shall be the best prices obtainable and not less generally than the market price of similar coals.

"We will guarantee against insolvent debtors of our selection or approval.

"We will guarantee the receiver against net operating loss or maintenance loss during the term of this proposal.

"We will not guarantee against the cost of labor suspensions, unusual accidents, disasters, acts of God or other matters beyond our reasonable control and not due to our negligence. * * *

"We will pay to the receiver the net proceeds of deliveries as above described, within a reasonable time after receipt of payment and ascertainment of net settlement bases, and will pay not later than sixty days after the date of shipments unless in some special cases unusual extension of credit is made with approval of the receiver or the Court."

by the cancellation of receivers' certificates; that the electric company had knowledge that the corporation was a separate and distinct entity and was operated as an independent purchaser of the whole output of the mines then being operated by the receivers; that the invoices for coal sold to the electric company by the corporation were rendered monthly and all checks of the electric company were payable to the corporation; that this custom had been in effect continuously since July 27, 1929; that all of the assignments of accounts by the corporation to the finance company were for a good and valid consideration, and that there was then due to the finance company from the electric company the sum of $10,977.78 on an account that had been assigned to the finance company by the corporation; that the electric company at no time claimed any right of set-off until it became apparent that future payments of bills claimed by it from the receivers were likely not to be paid.

The allegations in the petition and answers are, in the main, not disputed, except that appellant contends that the corporation was acting as the agent of the receivers in marketing the coal, while the appellees maintain that the corporation purchased outright from the receivers all coal mined by them, and was their vendee and not their agent.

The receivers were appointed July 27, 1929, and on that date submitted to the court the proposition, herein referred to, from the corporation to market the entire output of coal mined by the receivers. During a period of three and one-half years the electric company received invoices from the corporation for coal sold and delivered by the corporation to it, and payments were made by the electric company to the corporation. Every month, on the letterhead of the corporation, a statement of tonnage was sent to the electric company with a statement of moneys due for the coal sold. After the electric company received these statements, its check was made payable to, and delivered to, the corporation. Prior to March, 1932, the electric company paid its bill for coal in full, and the receivers paid their bill for current in full, with one exception, which was in May, 1931. On and after March, 1932, the electric company gave its check to the corporation for coal in the same amount that the electric company received from the receivers for electric power.

The corporation commenced discounting its accounts receivable with several finance companies the second or third day after its contract with the receivers became effective, which was July 27, 1929. No part of the account owing by the electric company to the corporation, and assigned by it to the finance company, amounting to $10,977.78, was paid. At the time of the hearing on the petition, it appeared that there was due from the corporation to the finance company by reason of the assignment of the accounts from twenty to twenty-four thousand dollars, which represented the cash that it had advanced to the corporation against $33,000 face amount of accounts then remaining unpaid. The finance company commenced doing business with the corporation in February, 1932, and since that time had purchased over $300,000 in accounts, all of which had been collected at the date of the hearing on the petition except approximately $33,000. The contract between the corporation and the finance company provided, in part, that the corporation was to sell, and the finance company was to buy, certain designated accounts for which the finance company was to pay 100 per cent. of the actual amount, less certain charges for compensation, with an initial payment of 70 per cent. and the remainder when the accounts were paid. By the terms of the contract between the corporation and the finance company, the latter was not required to return any part of the balance of the purchase price so long as any accounts remained unpaid, and could use the proceeds of any accounts toward the payment, satisfaction, and indemnity to itself of other accounts purchased from the corporation which remained unpaid.

The construction to be placed on the contract of the corporation with the receivers determines the rights of the parties on this appeal. If it constituted an agreement for the sale to the corporation of the entire output of the mines, then of course the right of set-off claimed by appellant could not exist.

If it was an agency contract, and the corporation acted as agent for the receivers in the sale of coal to the appellant, then the claimed right of set-off did exist in favor of appellant.

■ The District Court properly found that the contract was one for the sale and purchase of the entire output of the coal mined by the receivers, and not one creating the relationship of principal and agent. The offer of the corporation, accepted by the receivers, contained provisions reading in part as follows:

"We will purchase from the receiver the coal necessary for the fulfillment of all commitments. * * * We will pay to the receiver for the coal so purchased the full aggregate amount which shall be realized by us from the fulfillment of all coal orders and coal contracts, less the actual cost to us of the selling, the accounting and the supervision for receiver as hereinbefore provided (which said deductions shall not exceed a total of twenty cents per ton) and less one-half of the excess of the result over the sum of the receiver's aggregate normal labor costs of production and maintenance, his cost of power and supplies, his cost of workmen's compensation payments and his sundry petty costs of mine offices. * * *

"We will pay to the receiver the net proceeds of deliveries as above described within a reasonable time after receipt of payment and ascertainment of net settlement bases, and will pay not later than sixty days after the date of shipments unless in some special cases unusual extension of credit is made with approval of the receiver or the Court."

While it is true there are other provisions of the contract which are difficult to reconcile with the sales contract, we think a reading of the entire contract, without unduly stressing any one provision thereof, discloses that the parties intended that the corporation would buy the entire output of the coal mined by the receivers, and would pay the receivers for the coal an amount to be determined in the manner specifically set forth in the contract. While the relationship that existed between the receivers and the corporation was loosely spoken of as that of sales agent, nevertheless the conduct of the parties in dealing with appellant clearly indicates that the corporation was recognized by appellant as a separate entity, and as an independent purchaser of the coal. The corporation periodically sent statements on its letterhead to the electric company for coal delivered to it, and the electric company mailed the corporation its checks in payment therefor. The bills for the power furnished at the mines were sent by appellant to the receivers and, until this controversy arose, were paid by the receivers, except as indicated herein. The record clearly sustains the finding of the court that the contract was a sales contract.

Appellant contends that it was entitled to its claimed right of set-off because it is "creditor beneficiary" with the right of set-off, and to sustain that position relies upon the following provision of the contract: "We will pay to the receiver for the coal so purchased * * * less one-half of the excess of the result over the sum of the receiver's aggregate normal labor costs of production * * * his cost of power and supplies. * * *"

This provision was without doubt intended as a means of computing the price which the corporation was to pay for the coal it bought from the receivers. It was in no sense a promise to pay those items or to insure their payment. That the electric company looked to the receivers for payment is evidenced by the fact that it never billed the corporation for the power, water, and supplies furnished the receivers. There is no proof in the record that the corporation was at any time indebted to the electric company.

■ The appellant was not a "creditor beneficiary," and consequently not entitled to set off its claim for power furnished the receivers against its obligation for coal delivered to it by the corporation.

■ Under the contract with the corporation, the finance company had the right to collect the full amount of the assigned accounts, and was not required to return any part of the remainder over and above the 70 per cent. advanced, until it had been reimbursed the amount of its advances. On the date of the hearing, there was owing appellee, finance company, by the corporation a sum in excess of $20,000, representing its advances. The court, therefore, properly allowed this appellee to recover from the appellant the full amount of the assigned accounts. However, the District Court erred in allowing interest from the day after the intervening petition was filed to date of entry of decree. Where the right of set-off depends, as here, on the interpretation

to be given an instrument, the proper construction of which is a matter open to honest differences of opinion, interest to the date of the decree should not be allowed. McKey v. McCoid, 298 Ill. 566, 132 N.E. 233; Duncan v. Dazey, 318 Ill. 500, 149 N.E. 495.

Equity Rule 70½, 28 U.S.C.A. following section 723, which requires that the court of first instance in deciding equity cases shall find the facts specially and state separately its conclusions of law thereon, was properly complied with by the District Court. A memorandum of opinion, which included a finding of material and relevant facts, as well as conclusions of law, was filed, and the decree expressly ordered that the memorandum be made a part by reference as the findings of fact and conclusions of law adopted by the court. It was in substantial conformity with the rule mentioned, and sufficient to enable this court to properly exercise its appellate jurisdiction. Parker v. St. Sure (C.C.A.) 53 F.(2d) 706; Panama Mail S. S. Co. v. Vargas, 281 U.S. 670, 50 S.Ct. 448, 74 L.Ed. 1105.

The cause is remanded to the District Court, with direction to eliminate from the decree as entered the item of interest from May 5, 1933, to February 27, 1935, amounting to $994.22. In all other respect the decree is affirmed. One-fourth of the costs of the appeal shall be borne by appellees and three-fourths by appellant.

