## STATE ex SQUIRE v CENTRAL UNITED NATIONAL BANK

Ohio Common Pleas, Cuyahoga Co

No 428755. Decided Dec 17, 1935

Day & Day, Cleveland, Luther Day, Cleveland, Donald W. Kling, Cleveland, and Geo. H. Rudolph, Cleveland, for plaintiff.

McKeehan, Merrick, Arter & Stewart, Cleveland, H. H. McKeehan, Cleveland, Ashley Van Duzer, Cleveland, and Kingsley Taft, Cleveland, for defendant, The Central United National Bank.

Squire, Sanders & Dempsey, Cleveland, Clan Crawford, Cleveland, Boyd, Brooks & Wickham, Cleveland, Wm. H. Boyd, Cleveland, Horwitz, Kiefer & Harmel, Cleveland, and Paul Harmel, Cleveland, for defendants, Certificate Holders.

## OPINION

By DAVID RALPH HERTZ, J.

Viewed in the light of the high standards of fiduciary loyalty required of trustees, the Pool was a pernicious affair. It exposed the corpus of each trust to the twin parasites most destructive of trust estates, the trustee who sells his own property to the trust and the trustee who commingles the assets of the trust with his own.

It is one of the ironies of legal experience, however, that **Ulmer v Fulton, Supt. of Banks, 129 Oh St 323; 2 OO 326; 195 NE,** 557, should be cited herein as requiring that this court relegate these Certificate Holders to the position of general creditors of the Bank. That decision was formulated at the instance of certificate holders in a mortgage participation trust fund which the bank-trustee in that case had rifled; and the Supreme Court acted only to right those wrongs. It is here cited as authority for exterminating as such these Certificate Holders who make no complaint. What the Supreme Court used as a shield, this court is asked to use as a sword.

This court deems itself bound by that decision not only because the law requires that we be bound, but also because it announces a salutary rule of fiduciary conduct pointing toward loftier conceptions of a trustee's obligations and toward sounder banking practice. We therefore refuse to impute to it the paternity of the judicial monstrosity for which plaintiff's prayer herein would be midwife. We refuse to place upon the law of that case a distorted construction. A proper understanding of the case requires no such result.

The decision involved two actions. In one, Ulmer, a certificate holder, sought to enjoin the Superintendent of Banks from turning over so-called trust assets to a successor trustee. In the other, Ulmer intervened to resist an allowance of set-off by a depositor who was also a mortgagor on one of the mortgages held by the trust. Throughout these cases, Ulmer maintained that he was contending for the certificate holders as a class and for their best interests. The Supreme Court held first, that the certificate holders could not be bound by the trust because (a) the bank had had no power to create it, (to do so being ultra vires and contrary to public policy) and, in passing, (b) because in law no trust had been intended or created by the bank; second, that since the trust was invalid at the instance of the certificate holders they became general creditors of the bank, and, third, that it followed that the bank would be the owner of the mortgages and its depositors might set off their deposits against obligations thereunder.

While a literal-minded reading of the syllabi of the case in disregard of the facts and issues would construe that decision as declaring such trusts null and void at the instance of all and sundry, to so slavish a construction no court is bound. **Williamson Heater Co. v Radich et, 1934, 128 Oh St, 124;** 190 NE, 403. Nor are we bound to say that because the court did not discuss other rights of the Certificate Holders, no additional rights existed. A court has power

to declare the law of the case upon the issues submitted; it has no legislative power to announce general rules of law. Nor are its syllabi invested with that legal sanctity which would require that we give statutory force to every word or expression they may contain. The exactions of stare decisis include no servitude so abject.

"A reported decision, although in a case where the question might have been raised, is entitled to no consideration whatever as settling, by judicial determination, a principle not passed upon nor raised at the time of the adjudication." **Ins. Co. v Russell, 65 Oh St at 257,** quoting from **Fouts v State, 8 Oh St 98, 123.**

The Supreme Court was faced squarely with the question asked by a complaining certificate holder: "Do the statutes of Ohio authorize a combined bank and trust company to create a trust out of its own assets and sell participation certificates therein to others?" It answered: "The statutes of Ohio do not authorize a bank and trust company to act in the dual capacity of settlor and trustee by creating trusts out of its own securities and selling participation certificates therein to the public. Such undertakings are opposed to sound public policy and are invalid."

The character of the complainants, the relief which they sought and the issues presented and discussed by the court therefore require that the law of that case be thus stated: That in a suit by the certificate holders, i.e., the beneficiaries, of a trust wherein a banking and trust company acted as both settlor and trustee, dealt with itself as trustee and commingled trust assets with its own (pursuant, incidentally, to a purported but ineffective declaration of trust), the trust will be held invalid as to such complaining certificate holders and against the Superintendent of Banks as an ultra vires act of the bank and as contrary to public policy.

This holding, however sound, is not dispositive of the equities of the parties in the case at bar. It does not touch upon the rights of certificate holders who, though wrong, prefer to retain the trust. Nor does it touch upon the rights in equity of the beneficiary of an express trust that failed, to have a trust implied for his protection.

It is argued, however, that no trust of any kind may be implied in this case because among other reasons the State of Ohio in its sovereign capacity here seeks to undo acts in violation of its public policy. In fact, nearly the entire structure of the plaintiff's case herein is built largely upon the foundation of a claim to sovereign powers and immunities.

That foundation has been swept aside by the decision in **State ex Fulton, Supt. of Banks v Bremer, Admrx.,** decided Dec. 4, 1935, **130 Oh St 227,** wherein it was held that the Superintendent of Banks, suing under §§710-95 and 710-97 GC in the name of the State of Ohio to enforce the "super-added stockholders' liability" created by the Constitution of Ohio, sues not as a representative of the sovereign, but as a representative of the creditors of the Bank and is therefore clothed with no sovereign immunity that would fortify him against a defense under a statute of limitations. We are unable to distinguish the Superintendent's position in the case at bar from the position in that case. He derives his authority to sue and his right to employ the name of the State from the same sections of the Code, and these contain no language differentiating one kind of suit from another. Decisions of similar import may be found in,—

Wilson, Banking Commr. v Trust Co., 1932, 242 Ky. 432; 46 SW (2d) 769;

Anderson, Supt. of Banks v Nason, 1914, 25 Cal. App. 151; 143 P. 555.

Thus the State of Ohio is not before us as an avenging angel; neither are the Certificate Holders mortal sinners. In the Ulmer case, the court said:

"Of course the holders of the participation certificates are not without relief, actual knowledge of the invalidity of the trusts is not fairly chargeable to them. To hold under the circumstances that their money is irretrievably gone would be inequitable and unconscionable."

The same may be said as to these Certificate Holders with even greater force. While in that case the court dealt with ordinary investors, (the record therein shows that only $130,800 of the original par value in certificates of a total of $1,214,700 was held in trust of any kind and only $27,800 by the bank as trustee) in this case all certificates were issued at the instance of the Bank as fiduciary and title was taken originally to all certificates outstanding by the Bank as trustee. Under no theory may the Certificate Holders who were in confidential relationship with their fiduciary be said to have been in pari delicto with the Bank.

It is urged, nevertheless, that the Supreme Court condemned such trusts as against public policy and that equity will thereafter deny the Certificate Holders relief. The Supreme Court, however, made no such wholesale condemnation. The Participation Mortgage Trust Fund as a business device was not condemned; the court never discussed or considered that aspect. It never determined that the purpose of the trust was improper. It did condemn the practice of a banking and trust company which made itself trustee of its own assets and thereby exposed itself to the infirmities to which all trustees who deal with themselves are heir. It was the dual and limited capacity of the trustee that violated public policy, not the purpose of the trust. Despite the elements of public policy involved the Supreme Court did grant the certificate holders relief.

It is generally true that equity will not at the instance of a beneficiary effect by way of a resulting or a constructive trust the accomplishment of a purpose which, because of illegality or violation of public policy, is beyond the powers of an express trust. It is a far cry, however, from that doctrine to the plaintiff's contention that equity should intervene affirmatively at the instance of a trustee (or his successors) to enrich him (or them) because although the purpose of the trust was not improper, the trustee's undertaking was ultra vires and violative of public policy.

The following are examples illustrating the principle that although an express trust failed for illegality courts of equity under proper circumstances nevertheless protected the owner of the beneficial interest:

Herrick v Lynch (Ill. 1894) 37 NE, 221;

Duncan v Dazey, (Ill. 1925) 149 NE, 495;
Wahl v Taylor, (Iowa, 1916) 157 NW, 867.

In Wilson, Banking Commissioner v Louisville Trust Company, (1932) 242 Ky. 432; 36 SW (2d) 767, a trust company entered into an agreement with another by which the second agreed to become trustee of certain securities against which the first company sought to sell its mortgage bonds. The collateral was delivered to the trustee, but subsequently the first trust company became insolvent. As in this case, the Banking Commissioner in charge of protecting the interests of depositors, creditors and stockholders of the bank sued to recover the collateral on the theory that under certain statutes of Kentucky the transactions were ultra vires on the part of the first trust company. The court held as follows:

"The status of a commissioner when acting by virtue of the statutes is that of a trustee, assignee or receiver, but whether he be regarded as one or the other, his duties are the same. * * *

"The corporation cannot set up such abuse of its own authority to defeat such contract. * * * Under the principles of common equity and fairness, the bond holders being innocent purchasers, they are in equity entitled to the benefits of the transfer and delivery of the collateral security to the trustee to secure the payment of the bonds owned by them, and even if the (first trust company) or its receiver had the actual physical possession of the collateral security, such bond holders would be entitled to require a return of the collateral security to the trustee for their use and benefit as against the corporation or the banking commissioner. * * * If the (first trust company) had no legal power to take the steps by which the bonds in the hands of the purchasers were secured by the transfer and delivery to the trustee of the collateral security, having used this method of procedure and sold the bonds secured by the collateral and thereby obtained from the purchasers the cash for the bonds, it would be unreasonable and unconscionable to permit either the corporation or the banking commissioner * * * to have control of the administration or to compel the surrender of any or all rights of the trustee to the collateral and thereby deprive them of the use and benefit of the provisions of the trust agreement."

Thus, neither considerations of public policy nor the ultra vires character of the Bank's acts, require that this court act. What of the objections to our refusal to act?

Many such objections have been urged upon us. They suggest problems growing out of the effect of the recent Banking Code, §710 et seq, GC, upon our jurisdiction, other problems growing out of nice distinctions among resulting trusts, constructive trusts and equitable liens, and still others relating to the identification of the trust res.

If this were an action by the Certificate Holders for affirmative relief requiring that we raise a trust, a discussion of those objections would be pertinent. That, however, is not the situation before the court. Instead it is the Superintendent of Banks who seeks affirmative relief against a trust now operating. This court is called upon not to recognize or create a trust, but to set one aside.

We must consider the objections of coun-

sel in the light of that fact. Whatever the Banking Code may have done to our jurisdiction to act, it has had no effect upon our jurisdiction to refuse to act. And since each type of implied trusts takes its place in our jurisprudence fundamentally because equity abhors an unjust enrichment, the distinctions among them become meaningless under threat of an unconscionable result. Nor have the problems of tracing suggested by counsel any great difficulty for us. Resort to the much mooted "swollen asset" or augmentation theory is not necessary. The res has been identified for us, first by the Bank when it segregated the assets of the Pool, second by the Superintendent of Banks when he turned those assets over to the successive trustee (Surely he does not contend that he turned over property not belonging to the Pool). Third by the Superintendent in his correspondence with the Central United National Bank and finally by the Superintendent as plaintiff in this cause when he describes what he is suing for. There has never been any doubt about what represented Pool assets and what did not. If there had been, it would have been dispelled by the letter of the Superintendent of Banks to the successor trustee dated July 29, 1933, when he wrote:

"Inasmuch as those notes and mortgages were purchased by trust funds under the control of the Estates Trusts Department, it is clear that such notes and mortgages were not at any time after such purchase general assets of the Bank, but were impressed with the trust in favor of the beneficial owners of the trust funds used in the purchase."

These objections to a refusal to grant the relief prayed for are not pertinent therefore to the situation before this court.

There are, however, cogent reasons forbidding us to act, the expressed intention of the parties, the fiduciary character of the property received by the Bank as consideration for the certificates, and the unjust enrichment which would follow upon granting the plaintiff's prayer.

The conduct of the settlor in this case may be contrasted throughout with that of the settlor in the Ulmer case. The Bank signed the certificates specially as trustees and stated specifically that as trustee it would retain legal title. No power to substitute securities was reserved; the substitution of securities which here took place was in abuse of, not pursuant to, power. The certificates were issued only through the Estates Trusts Department when ordered for a designated beneficiary, and they evidenced participation in funds already invested in mortgages. In fact, none of the defects in the creation of the trust present in the Ulmer case are to be found here, except the elements of ultra vires and public policy.

Clearly an intention to create a trust was here expressed and acted upon. Once that was done, the subsequent irregularities constituted malefactions by the trustee, not evidence militating against the existence of the trust.

The following cases illustrate the doctrine that a bank which receives funds upon a clear expression that a trust was intended, will not be permitted in equity to retain full property in such funds:

Andrew, Supt. of Banks, v Security Bank, (Iowa, 1927) 213 NW, 245;

Ivie v Bankers et, (Idaho, 1933) 26 Pac. (2d) 794.

Further, fiduciary funds were paid to the Pool for the certificates. They were paid by The Union Trust Company as fiduciary for various smaller trusts to The Union Trust Company as Trustee for the Pool. When the Bank, in abuse of its powers as trustee, thus dealt with itself, the Pool assets became liable to the imposition of a constructive trust.

"Where the trustee by the wrongful disposition of trust property acquires other property, the beneficiary is entitled at his option either to enforce a constructive trust of the property so acquired or to enforce an equitable lien upon it to secure his claim against the trustee for damages for breach of trust as long as the product of the trust property is held by the trustee and can be traced." Restatement of the Law of Trusts. Vol. I, §202, page 534.

Finally when the Superintendent of Banks now requests that these assets, although the smaller trusts paid for them in full, be returned to the assets of the Bank, he asks that those trusts be deprived of property for which they paid, in favor of those who received full value for them. To restore to the seller (or his successor) the specific thing sold without requiring that he place the buyer in statu quo would be to lend the powers of this court to an unjust enrichment.

We have given study and thought to the other defenses interposed, estoppel in pais by reason of reliance upon the acts of the Superintendent, estoppel by reason of the intervention of or prejudice to inno-

cent third persons who have relied upon those same acts and upon the orders of this court, estoppel by reason of the position previously taken by the Superintendent of Banks and by depositors as a class in previous litigation, estoppel by reason of judgment, the bar of res adjudicata, the lack of remedy against consequences following upon a mistake of law, and the rights of the Certificate Holders under the XIV amendment of the Constitution of the United States by reason of the State Banking Department's interpretation of §710-164 GC. To discuss them after the views we have expressed above would serve no purpose save further to lengthen an opinion already inordinately long.

Suffice it to say that we believe the conclusion which we have reached might have been reached upon the ground of estoppel, as well as upon the doctrine of res adjudicata.

The matters here involved, however, are of great public interest. The rights of a large number of persons are concerned. A great deal of time was spent in the preparation, trial and study of this case. We have therefore preferred to reach our conclusion by weighing the equities of the parties rather than by prejudicing the rights of the Superintendent of Banks for conduct which, though embarrasing now, was inspired by what we believe was a sound view of the law, or by recognizing barriers to a determination upon the merits.

The prayer of the petition would in effect have us set aside as of no significance or effect the former order of this court appointing the successor trustee, although innocent parties have relied upon that order. We are unmoved by that prayer, for equity acts to prevent injustice, never to create it.

The beneficiaries of the trust were for the most part dependents whose decedents had entrusted the Bank with their estates. Others were charitable and eleemosynary institutions. To grant the prayer would be without justification to deprive these dependents and institutions of the rights created specifically for them.

On the other hand, denying the prayer involves no injustice to anybody. Neither the stockholders nor the depositors sustained any pecuniary loss by reason of the Pool's operations, the Bank received full value for every one of its assets that went into the Pool, while the Bank's lesses, relatively insignificant as they are, must be compared with the Bank's gains from the profitable trust business which the Pool attracted to the Estates Trusts Department.

Thus there is no reason for us to act and every reason why we should not. We are therefore constrained to leave the parties as we find them. Prayer denied.