Morris, Supt. of Ins., Appellee, *v.* Investment Life Ins.
Co. of America, Appellee; et al., Appellants.

[Cite as Morris v. Investment Life Ins. Co.,
18 Ohio App. 2d 211.]

212

(No. 9199—Decided June 3, 1969.)

*Mr. Paul W. Brown,* attorney general, *Mr. Brooks G. Trueblood, Mr. Clifford H. Bernard, Mr. Nat Lefton* and *Mr. Miles Evans,* for appellees.

*Messrs. Knepper, White, Richards & Miller, Mr. William E. Knepper* and *Mr. William L. Clark,* for appellants.

COLE, J.  In 1961, The American Life Insurance Company (hereafter called ALIA), a fraternal benefit insurance association organized under the laws of the state of Connecticut, was in difficulties because of its high expenses and was told by the Commissioner of Insurance for Connecticut to do something about it—with perhaps an implied threat of impending receivership.  At the same time the Investment Life Insurance Company of America, an Ohio stock life insurance company (hereafter called ILICA), was having troubles in Ohio.  It had started in 1959 and sustained consistent losses.  Hence ILICA was looking for expanded business; ALIA was looking for a way to reduce expenses; and the two came together.  Apparently, origin-

ally some form of management contract was discussed but as the talks progressed between the two management groups, a contract or agreement called "Reinsurance Agreement" emerged. Eventually this was approved by both companies, by the Insurance Commissioner or Superintendent of both Ohio and Connecticut and became effective on January 8, 1963. This agreement and its validity and effect is the core of the problem here presented.

In the course of the testimony it substantially appears that two weaklings in the insurance field tried to find strength in a common bond. The effort failed. On March 31, 1964, the plaintiff, William R. Morris, Superintendent of Insurance for the state of Ohio, filed a petition praying that he be given charge over the property and business of ILICA. On April 8, 1964, by order of the Common Pleas Court of Franklin County, he was duly appointed conservator.

On July 2, 1964, a petition for intervention was filed by one Osberger, which is not material herein, except that ultimately the Supreme Court defined the process of intervention and its limitations as a result of this petition in *Morris, Supt. of Ins.,* v. *Investment Life Ins. Co.* (1966), 6 Ohio St. 2d 185, thereby establishing part of the framework for the present case.

Subsequently, on August 5, 1964, John A. Silvas and others filed in the same proceeding an intervening petition seeking primarily to declare the Reinsurance Agreement of January 8, 1963, void, *i. e.,* rescission and certain allied relief, particularly return of ALIA assets to Connecticut. The basic prayer for rescission is predicated upon: (a) fraud, (b) illegality and (c) breach. The petition was first dismissed by the court below, but this decision was appealed and a decision rendered by this court reversing that judgment. Such decision, rendered February 15, 1966, determines also the framework for the present issues. Subsequently the case was tried by the court below on the issues raised, and the petition denied. The intervening petitioners, John A. Silvas and others, have now appealed again to this court on questions of law and fact.

In the case of *Morris, Supt. of Ins.,* v. *Investment Life*

*Ins. Co., supra,* the Supreme Court dealt with the problem of intervention in a conservatorship proceeding under Chapter 3903, Revised Code. It was held:

"3. In a proceeding pursuant to Chapter 3903 of the Revised Code to rehabilitate or liquidate an insurance company, the trial court has discretion to permit a materially interested petitioner to intervene.

"4. In a conservatorship proceeding brought pursuant to Chapter 3903 of the Revised Code, a trial court has power—both inherent and statutory—to limit the intervention of a materially interested person in order 'to prevent interference with the proceedings * * * or to prevent interference with the conduct of the business by the Superintendent.' "

Subsequently, in the first appeal herein on questions of law, this court had before it the question as to whether in the present intervention policyholders of ALIA have a right to intervene. This court said:

"Accordingly, in our opinion, while the policy holders are not entitled to the specific relief of the transfer of American Fund assets to Connecticut, the intervention petition in case No. 219867 sufficiently alleges a ground for relief. The policy holders are entitled to a determination of their rights with respect to the American Fund assets and are entitled to intervene in the receivership for that purpose."

Intervention was therefore permitted pursuant to the earlier determination by the Supreme Court. It was, however, limited, also pursuant to the discretion therein described so as to prevent interference with the conduct of the business by the superintendent. The scope of intervention was to determine the policyholders' rights with reference to the American Fund, and not to terminate custody, control or management of that fund by the superintendent.

The prayer for return of the American Fund to the state of Connecticut was, therefore, not before the trial court below nor is it before this court. The issue here is: What are the rights of the policyholders in the fund as placed in issue by the petition—and this question in-

volves essentially the validity of the contract of January 8, 1963.

# I

It is contended this contract is void *ab initio* by virtue of fraud committed upon ALIA and on its membership prior to its approval and consummation.

Part of the intervenors' case is predicated upon the concept that the officers and directors of ALIA were bribed by the officers and directors of ILICA by offers of substantial employment and salary arrangements to take effect after the merger of reinsurance contract had been consummated and thereby created a conspiracy making the officers and directors of ALIA the agents of ILICA. Thereby ILICA would be responsible for any misrepresentations made by the officers and directors of ALIA to their members.

With this contention we do not agree. The essence of the contract was the transfer of all assets of ALIA to ILICA for management. This created two situations: (a) There would no longer be any officers, directors, or employees of ALIA, *i. e.*, they would be necessarily seeking employment; and (b) ILICA in its business judgment could rationally foresee the need of experienced personnel to assist in the management of the newly created fund. It is quite common that merger arrangements (and this contract might approximate a merger as we shall see later) are worked out in some detail by the respective managements before directors or membership are consulted. 13 Ohio Jurisprudence 2d 272, Section 807. And in 8 Cavitch: Business Organization paragraph 168.02 (9) it is said, "In many instances the purchasing corporation may wish to retain the management of the acquired corporation. Often the purchasers may suggest that such employment be tied to a contract."

In short, the mere fact of an employment offer to the management of ALIA by ILICA does not create a conspiracy. Nor does this appear to have been as secret as the intervenors would contend. Both the insurance departments of Ohio and Connecticut knew about it (August 9, 1962) long prior to the approval of the contract. It was

obvious from the contract itself, which was freely and fully circulated, that ALIA would no longer operate and its management and employees would be required necessarily to find other employment. It was announced by the president of ALIA at its delegates convention that he and the other officers would be continuing with the fund. And only a few of the officers chose to accept the proferred contracts. ILICA, far from concealing its offers, spread them on the minutes—available to the insurance departments for examination.

The situation is admittedly subject to other interpretations—but to establish fraud as a ground for rescission, it must be established by clear and convincing evidence. *Cross* v. *Ledford* (1954), 161 Ohio St. 469. See, also, *Household Finance Corp.* v. *Altenberg* (1966), 5 Ohio St. 2d 190. The evidence on this point is, we conclude, subject to two interpretations, *i. e.*, bribery or business judgment to assure competent personnel, and this ambiguity still exists after consideration of all the evidence. This being the case, the "conspiracy" is not established by the necessary degree of evidence, and the management of ALIA cannot be considered agents of ILICA.

In the absence of the necessary degree of proof of conspiracy, the officers of ALIA were the agents of their membership, and the contract was negotiated by the two sets of agents, one set for each company, in what was essentially an arm's length transaction, each seeking the maximum for its own company. Poor business judgment, if such occurred, is not fraud.

False representations or concealment alone are not actionable. There must exist a causal chain from the fraud of one party to the act of the other. The necessary causal link is called reliance, and the causal sequence is well outlined in the second paragraph of the syllabus of *Cross* v. *Ledford, supra*:

"In order to maintain an action to rescind a contract on the ground that it was procured by fraudulent representations, it must be proved by clear and convincing evidence (1) that there was actual or implied representations of material matters of fact, (2) that such representations

were false, (3) that such representations were made by one party to the other with knowledge of their falsity, (4) that they were made with intent to mislead a party to rely thereon, and (5) that such party relied on such representations with a right to rely thereon."

Thus the first question in the instant case is as to the persons, the cast of characters, the claimed defrauder and the defrauded, linked by the fraudulent act and the act of reliance. Here we have a cast basically composed of two artificial persons, ILICA, an Ohio stock insurance corporation, and ALIA, a Connecticut fraternal society. The causal chain must proceed from one to the other, and, since each is an artificial person, it must act through its agents. We have eliminated one avenue of the causal progression in holding that the officers of ALIA were not engaged in a conspiracy and hence could not be considered agents of ILICA. The second avenue would be the statements, actions and representations of the actual officers of ILICA. And the question becomes: If there were any false representations, were they relied upon by ALIA?

We have three levels of potential reliance in ALIA: by its officers; by the delegates to its convention; and by its membership in a general mail canvass. The evidence here is quite limited. Since the contract itself was given as wide dissemination as possible, including a general mailing with an independent summary made by the Connecticut Insurance Commissioner, no misrepresentation or concealment existed as to its terms. The only possible area of fraud was with reference to the financial condition of ILICA.

Mr. Segedy, the president of ALIA, says he relied upon the actuaries and the financial statement of December 31, 1961 (The 1962 statement was not made until 1963, after the contract was signed.), and upon approval by the Connecticut Insurance Commissioner. He also relied upon the fact that shares of ILICA had been purchased by an Investment Fund without apparently any further inquiry of the fund. Other witnesses, policyholders, indicate they relied either on their own officers or the insurance departments of the two states.

There is testimony that the president of ILICA made false or at least ambiguous replies to questions at a convention of delegates of ALIA. However, most witnesses did not recall these statements but said they relied either on their own officers or on the insurance departments. The one who did recall did not rely upon the answers, having made his own independent investigation.

This being the case, there is no clear and convincing evidence that any one or any level in ALIA relied upon any direct misrepresentation by any agent of ILICA, there being no indication the actuaries were given false information.

We then come to the questions of indirect representation. Although there is evidence of misrepresentation by ILICA to the insurance commissioners of both states in March 1963 and 1964 (or at least a highly strained interpretation of "funds in transit"), there is no evidence that the 1961 statement or the March 1962 statement submitted to Connecticut was false. These were statements used by the departments and by the ALIA actuaries. We conclude that there is no clear and convincing evidence as to indirect fraud through the approvals of the two insurance departments or of any failure to supply, on request, information from either department.

We conclude that fraud or the necessary reliance thereon is not established by clear and convincing evidence and is, therefore, no ground for rescission of the contract or to declare it void.

## II

The second ground urged by the intervenors for declaring the contract void is noncompliance with Ohio statutes by the department of insurance in the approval of the contract. It is urged that the contract is actually a contract of merger, but, whether it be of merger or of reinsurance, the Ohio statutes (specifically Section 3907.11, Revised Code) require the approval of a commission consisting of the Governor, Attorney General and the Ohio Superintendent of Insurance, which was never obtained. In the event the contract be interpreted as reinsurance, then Section 3907.12, Revised Code, provides again for a

similar commission to approve the contract, and this was not done. They claim, therefore, that the contract, because of this failure, was in essence *ultra vires* and void under both Ohio and Connecticut law, which requires as a condition precedent the compliance with Ohio law.

It would appear that the plaintiff, appellee herein, urges that the contract provides for "substitution" insurance and that neither set of statutes would be applicable.

The problem is one of round statutory holes and a square peg contract. It does not completely constitute a contract of reinsurance or of merger or of management, and yet it contains elements of all. It is, in short, a hybrid, and the issue involves the appropriate application of the statutory requirements to such a hybrid.

Analysis of the terms of the contract show that it is divided into two chronological areas. During the period of its initial existence, and continuing until the time the total insurance of the American Fund is less than one-half the amount in force at the effective date the fund was created, the contract primarily is a contract of management. The assets of ALIA are to be kept in a separate fund not subject to any debts or liabilities of ILICA, and ILICA's sole interest in the fund lies in the management fees therein provided together with such individual policies as may be voluntarily transferred from one company to the other by specific policyholders. True, there is an assumption clause which makes ILICA liable under all ALIA policies from the start; but during this period such an assumption is most remote in application, since the full American Fund is the source for initial payment.

The second time sequence does not, as claimed in some of the arguments, begin when the policies in force have diminished to one-half. This is only a part of the dividing conditions. Paragraph VIII of the agreement reads as follows:

"Sec. VIII. Termination of Fund

"The fund shall terminate *with the approval of the Superintendent of Insurance of the state of Ohio* at the close of the calendar year during which the total amount of insurance assumed hereunder (excluding term insur-

ance) shall first decline by lapses or any other mode of termination to one-half the amount of such insurance assumed hereunder (excluding term insurance) and thereupon all assets and liabilities of the fund shall be comingled with the assets and liabilities of ILICA and all American policies shall be administered as participating policies in accordance with the insurance laws of the state of Ohio and all regulations of the Insurance Department of the state of Ohio appertaining thereto. The dividend to be paid in the year that the fund is terminated shall be approved by both the Commissioner of Insurance of the state of Connecticut and the Superintendent of Insurance of the state of Ohio." (Emphasis added.)

It will be noted that the approval of the Ohio Superintendent of Insurance is a prerequisite to the initiation of the second phase of the contract. If the insurance in force has diminished to one-half, then, *only* with such approval does the next phase commence. This can undoubtedly constitute a technical merger, for the American Fund assets would be commingled with the assets of ILICA and the assumption agreement would come into full and meaningful effect.

In short, the contract itself provides for further action by the Department of Insurance of Ohio. The consent of the commissioner under Sections 3907.10 and 3907.11, Revised Code, to a merger cannot be given unless there has been a hearing and a determination by the commission provided for by Section 3907.11, Revised Code, and such merger shall only be approved by the consent of all the members of the commission, whose duty it is "* * * to guard the interests of the policyholders of any such company proposing to merge or consolidate."

Since this phase of the contract was to be performed in Ohio and requires specific approval by an Ohio official, the requirements of Ohio law under which such approval can be given must be considered to be incorporated into and made a part of the contract. *Jacot* v. *Secrest* (1950), 153 Ohio St. 553; *Bell* v. *Northern Ohio Telephone Co.* (1948), 149 Ohio St. 157.

It would be our conclusion that this contract can be

properly considered only in relation to these statutory requirements by considering the two phases as involving separate considerations and treatment. The first phase creates primarily a trust and management relationship. The contract as to phase one specifically required consent of both the Ohio Superintendent of Insurance and the Connecticut Director of Insurance. We have been cited to no statutory regulations, nor have we been able to find one, dealing specifically with such a management contract. This phase may continue for an indefinite period of time as the commissioner and the commission described above in Ohio may determine.

The second phase of merger and assumption of full liability without a trust fund bearing primary responsibility for the policies is such a merger as is contemplated by Sections 3907.11 and 3907.12, Revised Code. When then must this approval be given? Before the basic contract is approved or before the second phase of the contract pursuant to Section VIII is initiated?

We find no authority on this point, for, as we say, this contract appears to have unique elements, which make it something of a hybrid. However, the logic of the situation impels us to conclude that such commission approval is not necessarily required at the beginning of the contract but is mandatory when the merger phase must be approved. For the commission provided by statutes to foresee all the trials, vicissitudes, and fortunes of both merging companies for an indefinite future period encompassing the management phase would appear to be impossible. Consent and approval so given would be highly hazardous. But if approval be timed to the initiation of the second phase of the contract—the actual merger—then, the full scope of protection would be afforded. The immediate situation of the respective companies would be subject to more accurate prognosis at a time when the rights of the policyholders would be facing a critical change. Prior thereto, during the management phase, the fund being in the nature of a trust, those rights would be less subject to potential harm since the administration of the trust was subject to filing statements in two states and the operation subject

to the continuing supervision of the Ohio Superintendent of Insurance.

In fact, this protective feature is best illustrated by the present case, for it is now apparent that the merger would be detrimental to the policyholders of the American Fund, and it is inconceivable in the light of current circumstances that the commission provided for by Section 3907.11, Revised Code, would approve the merger or the Superintendent of Insurance alone so approve.

In the absence of such approval under the terms of Section VIII of the agreement of December 10, 1962, the merger with ILICA cannot occur even though the total amount of insurance assumed should decline more than one-half and the American Fund as a trust fund under management of ILICA or its successors would continue.

As to the question presented by the assumption or "reinsurance" clause, we do not believe this to be a prime objective of the management phase of the contract. In fact, Mr. Gruner, senior examiner for the department of insurance, testified as to the funding of liability for this assumption, stating, "But it would appear to me as long as the funds, actuarial liabilities under their outstanding policies are adequate, and are protected by the assets of the fund, that no liability has gone over." In short, during this phase the primary liability of the American Fund for payment of policies to ALIA policyholders was such as to make the assumption or reinsurance clause theoretical. However, the assumption or reinsurance clause was vital to the second, or merger, phase when assets would be commingled. This being the case, the agreement was for ultimate merger, with reinsurance secondary and instrumental to the merger. For this reason we hold the merger statute, Section 3907.11, Revised Code, and not the reinsurance statute, Section 3907.12, Revised Code, is the one governing the approval by the state of Ohio, and, as before stated, its terms and procedure are in this case mandatory only at the time approval for merger is sought pursuant to the terms of the contract and not at the time of approval of the original agreement.

This being our conclusion, the agreement is

not void for failure to comply with the statutory requirements of Section 3907.11 or Section 3907.12, Revised Code. There has been no application for approval of a merger or mingling of assets, and, consequently, further issues that might be presented by a subsequent application for approval are not before this court, but initially for consideration by the merger commission.

## III

It is urged that the contract was void by breach and by the impossibility of performance by ILICA. This contention of the petition was not argued in the briefs, and we find no substantial evidence to sustain it. ILICA was faltering but by no means failing at the time of the contract beginning. It was apparently capable at that time of management of the American Fund and did so manage it. The Superintendent of Insurance has so managed it as the successor to ILICA since the date the conservatorship began. Although there was evidence as to disagreement on the payment of expenses, these differences were adjusted to the satisfactions of both the Ohio and Connecticut Departments of Insurance, and a substantial purchase of a nonadmitted asset was subsequently corrected.

We would hold the contract is not void for breach or nonperformance.

## IV

If the contract is not void, then it is valid and subsisting; but to fully explore the issues raised by the petition of intervenors, it is necessary to determine the nature of the legal and equitable relationships which now exist by virtue of it.

As we have indicated in a preceding section, there are two separate phases, and the first of these is the management phase. ILICA has taken title in its own name to all assets heretofore belonging to ALIA. It is specifically provided that these assets, whatever their form, are to be "maintained in a fund, known as American Fund, until the termination date specified in Section VIII, to secure all American liabilities and to provide the fund surplus for the benefit of American policyholders as hereinafter defined." It is further provided what shall be paid from the

fund, being essentially benefits payable to policyholders and certain enumerated categories of operating expenses. It is further provided that while the fund is continued ILICA shall "receive no profits from such assets or the business reinsured (except for the allowance due it as provided in Sec. IV)." And Section IV provides for specific fees to ILICA for its administration of the fund.

This is clearly the creation of a trust relationship. The settlor was ALIA (or perhaps it may be said the policyholders of ALIA acting through their then duly authorized agents). The trust *res* is clearly specified. It is the fund created out of all the assets of ALIA and to be held in a separate fund chargeable only with certain expressly outlined payments. And the trustee is clearly ILICA, taking legal title to the fund but under obligation to manage it for the benefit of ALIA policyholders and under obligation not to mingle it with its own assets prior to the termination date—in short, a fiduciary.

Finally, the policyholders of ALIA are expressly made the beneficiaries of the fund, their beneficial interest being defined as to each by the terms of his policy—and it is the obligation of the trustee to collect future premiums and investment income and pay to accruing policies their benefits thereunder.

Although of a special nature due to the insurance aspect, this is analogous to an investment trust where the trustee manages, pays expenses, collects a fee for his efforts and is obligated to pay to the beneficiary under the terms of the trust contract.

The definition of a trust given in 1 Restatement of the Law of Trusts 2d 6, Section 2, is as follows:

"A trust, as the term is used in the Restatement of this subject, when not qualified by the word 'charitable,' 'resulting' or 'constructive,' is a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it."

In *Norris* v. *Norris* (1943), 40 Ohio Law Abs. 293, this

definition in its essentials is quoted with approval and the following is said as to intention:

"An express trust may be created even though the parties do not understand what a trust is, and whether or not so created may be determined from all the circumstances surrounding the transactions between them."

While it is true the parties in the instant case do not call this a trust, this is not determinative. It is also true ILICA guaranteed or promised to pay the obligation to the policyholders of ALIA—but this was in addition to, not a substitute for, the obligation to use the American Fund for that purpose. These assets were to be maintained separately and used only for this purpose. Although the guarantee might be conceived as a debtor-creditor situation, the primary obligation to pay from the American Fund corresponds in all aspects to the definition of a trust.

We would conclude that all circumstances in the case indicate that in the primary phase of the contract—the management phase—an express trust was created, contrasting strongly with the second phase in which no separate fund would exist, and a simple contractual relationship of insured and insurer would take its place.

This then being the case, ILICA holds the American Fund as trustee for management purposes for the benefit of ALIA policyholders.

Provision for the termination of this trust is made in Section VIII heretofore set forth in full. Termination is conditioned on the existence of two coinciding events:

a. The close of the calendar year when the total amount of insurance on January 8, 1963 (the effective date of the contract), shall first decline to one-half that amount, and

b. The approval of the Superintendent of Insurance of the state of Ohio.

It is certain condition a. will occur. The American Fund, with the termination of activities in selling new policies (and no provision was made for new policies to be issued), became a closed fund. Through death and lapses there would be a steady downward attrition in the to-

tal amount of insurance in force. Thus, at some indefinite time after the contract was effective it was certain in the nature of things this event would occur.

However, event *b.*, the approval by the state of Ohio (we have indicated before that this would require commission approval), might never occur. It was not, like the first event, certain at sometime to happen. Such approval might be indefinitely and perpetually withheld. If such should be the case, phase one, or the management phase, might never terminate—and this possibility, inherent in the contract, was within the contemplation of the parties when they entered into it.

Should this event then not occur, the fund would during its entire existence remain a trust fund. Being a closed fund, it would then continue steadily decreasing until it paid out on the death of the last policyholder, assuming the fund to be actuarially sound, and there is no evidence it was not actuarially sound at the inception of the contract.

Therefore, there were two potential futures for this fund at the time the contract was made. It could end by merger or it could end by a continuation of the trust management relationship until the last policyholder was paid.

The second event has not occurred. No approval to terminate has been given. Moreover, in the very nature of the situation that approval can never be given. Both the Superintendent of Insurance and the merger commission are charged with the duty of protecting policyholders. If merger were now to occur, a mingling of the assets of the American Fund with the general assets of ILICA, a portion of it would necessarily go to pay debts of ILICA. This would not be to the benefit of ALIA policyholders but to their detriment, reducing the fund existing for their ultimate benefit. It may, therefore, be conclusively assumed such consent would never occur and is now impossible. ALIA never consented by the contract to mingling of assets with any other company than ILICA. The trust-management relationship, therefore, has not and will not terminate until the fund has been fully distributed on payment to the last policyholder. What was conceived by the parties originally as a temporary trust, should all go well,

has become a permanent trust—as all has decidedly not gone well.

We, therefore, have a continuing express trust, the American Fund, the trust *res*; the policyholders of ALIA, who still hold policies; the beneficiaries; and ILICA, the trustee charged with management and administration of the fund. And the Superintendent of Insurance, since ILICA is now in process of liquidation, pursuant to Section 3903.07, Revised Code, has succeeded as title holder of the fund.

The problem, therefore, becomes a problem of replacing the trustee of a continuing express trust, in short, of filling a vacancy. The trust agreement provides no method and reserves no powers in this situation.

In 53 Ohio Jurisprudence 2d 527, Section 62, it is said:

"Whenever a vacancy occurs in a trusteeship, whether from failure of the settlor to name a trustee or from death, dissolution, incapacitation, disclaimer, resignation, or removal of the trustee named, the Probate Court, with respect to testamentary trusts, and the court having equity jurisdiction with respect to other trusts, have the power to appoint a new trustee to fill such vacancy if the trust instrument does not provide another method of filling it. * * *"

In *Holbeck* v. *Squire* (1937), 26 Ohio Law Abs. 322, it is said, at page 326:

"In this case, if the trustee named in the indenture for any reason is not qualified to properly administer the duties of trustee, devolving upon it, then there is another individual or association which would be as well qualified as the named trustee to carry out the purposes of the trust. There is no discretion vested in the trustee of such personal nature as to make it indispensible to the accomplishment of the purposes of the trust and a court of proper jurisdiction could, upon showing justifying the action, remove the named trustee and appoint another."

Since it is fully apparent from the record that ILICA is in no position to continue as trustee, and since the continuing administration of a trust fund is not a duty of the Superintendent of Insurance, it would appear that the

proper and only action to be taken at this time is the naming of a new trustee to conduct the management of the trust pursuant to its terms.

There is nothing in the nature of the trust here created which involves personal discretion. Sound management judgment is required, but this can be supplied in the instant case as well by another individual or association. However, it is emphasized that the trusteeship is not an asset of ILICA. The right to be trustee was initially invested in ILICA by contract. The duty carries with it the right to compensation—but this is not a right or an office subject to assignment by ILICA or by its liquidating successor, the Superintendent of Insurance. As the foregoing authorities indicate, where no provision is made in the instrument for naming successor trustee—and none was—the selection of a successor trustee is a matter for appointment by the proper court of competent jurisdiction.

There is, moreover, nothing else left in the contract which would be an asset of ILICA. The merger of ALIA and ILICA is now impossible. The slow merger process, wherein it was provided individual policyholders might take new policies with ILICA and ILICA take over as its asset the reserve attributed to that policy, is now impossible—ILICA is no longer capable of issuing policies. And the right to merger is not an assignable right, for it involves approval and reliance upon unique characteristics of the companies proposing merger. *Starchroom Publishing Co.* v. *Threlkeld Engraving Co.* (1920), 13 Ohio App. 281. The history of negotiation and approvals shows that only merger of these two specific companies was contemplated, and the very nature of merger is contrary to an inference of assignability.

The guarantee or assumption which was made by ILICA as to payment of ALIA policies is now meaningless.

The continuing and existing portions of the contract, therefore, are reduced to those creating the continuing express trust. There is nothing more. And the appointment of a successor trustee is not a matter of the sale of an asset but the appropriate selection by a court of competent jurisdiction.

"The administration of a nontestamentary trust is supervised by the courts of the state where the trust is located. * * * in the case of a trust of personalty, it is the state where the trust is administered. * * *" 54 Ohio Jurisprudence 2d 62, Section 169.

In the present case the trust is administered in Ohio, by an Ohio corporation, and by its successor, the Ohio Superintendent of Insurance. The contract contemplated and provided for administration in Ohio, by an Ohio insurance company and subject to Ohio laws. The jurisdiction for the appointment of a new trustee is, therefore, vested in the courts of Ohio. However, the present petition does not request this action, nor is it appropriate in a liquidation proceeding which provides essentially for the disposition of assets but not for the continuing supervision of a trust fund.

This could only be accomplished by proper application to an appropriate court for this specific purpose and in a separate proceeding with the subsequent transfer by the Superintendent of Insurance of the American Fund to the named successor trustee.

Finally, the intervenors in this case are policyholders of ALIA and appear here as such. Whether they represent the full class of policyholders or merely are here before us as individual policyholders is immaterial. They are beneficiaries of an express trust. Their interest in that trust is defined by their respective policies, and from the nature of the fund it can be said they have no right to specific distribution of any portion of the fund except as may be provided in their policies. However, a beneficiary of a trust has an interest in the proper management of that trust and in particular that an appropriate administration of the trust is being conducted. They, therefore, would have a specific interest in the appointment of a successor trustee. They are also interested in the preservation of the trust fund itself, and for this reason equitable relief is pertinent and proper, though not the specific relief requested by the appellants. The intervenor appellants are entitled to a qualified or limited order in response to their prayer. The Superintendent of Insurance is directed, as conserva-

tor of the assets of ILICA, to set apart the assets of the American Fund for the benefit of the policyholders of ALIA, which funds are not to be returned to Connecticut but held subject to the supervision of the court below, for disposition, pending future hearings by an appropriate court to designate a successor trustee and further administration of the trust.

This cause is remanded to the trial court for further proceedings consistent with this decree and the exercise of its inherent equitable powers, or, for transfer to an appropriate court with jurisdiction to name and supervise a successor trustee for the further administration of the trust.

*Judgment accordingly.*

DUFFY, P. J., concurs.

TROOP, J., concurring separately. This concurring opinion is intended to emphasize certain facets of this appeal, which appear to this member of the court as peculiarly significant, and is in no sense to be interpreted as in derogation of the excellent opinion produced by my colleague.

The conclusion that the contract with which this appeal is concerned is not void because of fraud committed upon ALIA and its membership prior to its consummation is sound. A review of the record necessitates the position that the claim of fraud advanced by the intervenors is not supported by clear and convincing evidence, the measure of proof required to establish such fraud.

A second ground urged by the intervenors for declaring the contract void is much more troublesome. Intervenors suggest that the contract is void for failure of the department of insurance to comply with Ohio statutes. I quite agree with the observation of Judge Cole that our problem "is one of round statutory holes and a square peg contract." If that be true, the necessary conclusion is that the contract just doesn't fit into Ohio's statutory device, and it is of no help so far as this member of the

court is concerned to divide the contract into two distinct parts, one part an interim management contract for the control of ALIA assets by ILICA, and the other part a contract of merger or reinsurance subject to the approval of the commission required by Sections 3907.11 and 3907.12, Revised Code. That does not make the contract a peg sufficiently round to fit into the statutory hole.

The Superintendent of Insurance derives his authority from specific statutes. Chapter 3901, Revised Code, "Superintendent of Insurance," defines duties and outlines powers, provides for supervision and examination of companies, and includes provisions for the acquisition of companies and the possible relating of directorates. Chapter 3903, Revised Code, deals with the "Liquidation of Companies," which is done largely under the control of a Common Pleas Court. Chapter 3907, Revised Code, titled, "Domestic Legal Reserve Life Insurance Companies," is particularly important in this review because it deals with the formation, incorporation, and disposition of companies under department direction.

An examination of the chapters fails to reveal any statutory authority under which the Superintendent of Insurance may undertake an interim contract for the management of assets on behalf of a company licensed by the state of Connecticut. The contract under scrutiny can only be a contract contemplating merger or one providing for reinsurance. The fact that the contract here involved is titled "Reinsurance Agreement" is of no consequence. A reinsurance contract is characterized by the language employed in Section 3907.12, Revised Code, providing that a company may:

"* * * enter into a contract of reinsurance by which all of the policy obligations of one company, and such other liabilities as are specified in the contract are assumed by another company."

The identifying feature of reinsurance is the assumption of liabilities.

Merger or consolidation is possible under Section 3907.09, Revised Code, which provides for such by any

232

domestic life company. Merger entails the consolidation of both assets and liabilities. In the instant case, ILICA took over the assets of ALIA, and it matters not that an interim device was incorporated in the contract by which the Ohio Superintendent of Insurance took over the management of assets and the gradual retirement, or reissuance, of policy liabilities, the ultimate purpose of the contract was merger. The contract, or "Reinsurance Agreement," was designed to accomplish a backdoor merger without compliance with the statutory provision for a commission (Sections 3907.11 and 3907.12, Revised Code) to hear and determine, to approve and authorize:

"If satisfied that the interests of the policyholders of such company are properly protected, and that no reasonable objection exists thereto, * * *."

It must not be overlooked that the agreement puts title to the assets in ILICA "as the absolute owner thereof," and requires that notice be mailed to each ALIA policyholder "whose policy is assumed by ILICA." The contract is *a* contract of merger. In the light of statutory language, there is no such thing as a "hybrid" contract. It is either one or the other, but here it is clearly a merger contract.

A merger contract is only valid if it comes into existence under the requirements of Section 3907.11, Revised Code. (If it were reinsurance a similar requirement under Section 3907.12, Revised Code, would apply.) The record does not show compliance with the provision for a commission, and there is no record of approval and authorization "in writing" by a commission. The contract is "void" for lack of compliance.

Judge Cole sees the contract, not as void *ab initio*, but as a contract with an interim arrangement operating in the nature of a trust. It must be conceded that the practical fact is that the superintendent has in his hands assets of ALIA, which have been managed essentially as a trust. If the contract here considered is a two-phase document, then to conclude that there is an express trust is proper and logical. This member of the court prefers to regard the

"trust" to be best described as a "resulting" or "constructive" trust.

Most commonly, if a trust is regarded as "resulting," an intention to create a trust is implied. Such is doubtful in the instant case. The term, "constructive trust," is more in keeping with the present arrangement. The assets were wrongfully acquired—under an illegal contract, the trustee being without statutory authority to so function. It is of no consequence that the superintendent is now the trustee. His title came through ILICA, the company having received its title by illegal process, and the superintendent stands as a successor trustee, now holding assets which may accrue to the benefit of ILICA policyholders, when in equity they are for the benefit of the policyholders of ALIA. Wrongfully acquired in the first instance, they are still wrongfully acquired assets in the hands of the superintendent.

It is frequently said that both resulting and constructive trusts are creatures of equity designed to prevent unjust enrichment through mistake. As the arrangement stands today, as Judge Cole points out, ILICA, predecessor of the superintendent, holds the trust corpus, or the ALIA fund, for the benefit of ALIA policyholders, but if a merger were now to occur the assets of the American Fund would be mingled with the assets of ILICA, now in financial trouble and in the hands of the insurance department, a portion of which would accrue to the benefit of ILICA creditors. This would be a detriment to ALIA policyholders and an unjust enrichment to ILICA policyholders.

Distinctions as to resulting or constructive trusts are meaningless. Under threat of an unconscionable result either one will do, because "equity abhors unjust enrichment." In the instant case, the term "constructive" fits. (See 53 Ohio Jurisprudence 2d 575 *et seq.*, Section 87 *et seq.*, and *Norris* v. *Norris* [1943], 40 Ohio Law Abs. 293, Second District Court of Appeals.)

Case law is scarce in Ohio. The Common Pleas Court of Cuyahoga County decided *State, ex rel. Squire,* v. *Cen-*

*tral United National Bank* in 1935, 20 Ohio Law Abs. 238, in which the Superintendent of Banks sought to set aside a trust, in which the defunct bank was both settlor and trustee, manipulating the corpus to its own convenience to the point where the term "illegal" was descriptive. The Superintendent of Banks, representing the general creditors of the bank under liquidation, sought the trust assets for the general creditors. The court refused him the right to do so. The position of the Superintendent of Insurance here is comparable to the position of the Superintendent of Banks in *Central United.*

The conclusion reached by Judge Cole that there is a "trust" in the instant case is quite correct, although this member of the court prefers to regard it as a constructive trust resulting from an illegal maneuver. Equitable relief is necessary.

I concur in the order directing the cause to be remanded to the trial court for further proceedings consistent with this decree, and according to law and the exercise of its inherent equitable powers.

COLE, J., of the Third Appellate District, sitting by designation in the Tenth Appellate District.